Filed 10/14/16

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| CALIFORNIA PUBLIC RECORDS RESEARCH, INC., | C078158 |
| Plaintiff and Appellant, | (Super. Ct. No. PT112537) |
| v. | |
| COUNTY OF YOLO et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Yolo County, Kathleen M. White, Judge. Affirmed.

Donald W. Ricketts for Plaintiff and Appellant.

Philip J. Pogledich, County Counsel, and Eric May, Deputy County Counsel; Porter Scott, Terence J. Cassidy and Taylor W. Rhoan for Defendants and Respondents.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

Government Affairs Consulting and Robert E. Grossglauser III for County Recorders' Association of California as Amicus Curiae on behalf of Defendants and Respondents.

In September 2012, appellant California Public Records Research, Inc. (CPRR) filed a petition for writ of mandate and complaint challenging fees charged for copies of official records by the Yolo County Clerk Recorder's Office. The petition alleges that respondents Yolo County and County Clerk/Recorder Freddie Oakley (collectively, County) failed to perform a mandatory duty to limit copy fees, in violation of Government Code section 27366 (section 27366), article XIIIC of the California Constitution (Proposition 26) and California common law.[1] The complaint seeks a declaration of the parties' rights under section 27366, and a further declaration that the Recorder's actual cost to produce copies does not exceed $0.10 per page. The complaint also alleges that the County was negligent in setting copying fees, and seeks damages and money had and received on behalf of a putative class of persons who paid the allegedly excessive fees.

The County moved for summary judgment on the grounds that section 27366 authorizes the Board of Supervisors (Board) to exercise discretion in setting fees, there was no genuine issue of material fact as to whether the Board abused its discretion, and fees were reasonably related to the cost of producing copies. The County also argued that CPRR's causes of action for negligence and money had and received were barred by the Government Claims Act, section 810 et seq. (the Act), and the petition for writ of mandate was moot, as the County had voluntarily reduced copy fees from $10.00 for the first page and $2.00 for each subsequent page ($10.00/$2.00) to $7.35 for the first page and $2.00 for each subsequent page ($7.35/$2.00). The trial court granted the motion and entered judgment in the County's favor.

CPRR appeals, challenging the trial court's interpretation of section 27366 and insisting the County abused its discretion in setting copy fees. CPRR also contends the

---

[1] Undesignated statutory references are to the Government Code.

trial court improperly reconsidered and reversed an earlier order overruling the County's demurrer to CPRR's causes of action for negligence and money had and received, thereby exceeding its jurisdiction. We have reviewed the record and conclude that summary judgment was properly granted. Accordingly, we shall affirm the judgment.

Following summary judgment in the County's favor, CPRR moved for an award of attorneys' fees under Code of Civil Procedure section 1021.5, claiming the litigation served as a "catalyst" for the County's decision to reduce copy fees. The trial court denied the motion. Finding no error, we shall also affirm the order denying the motion for attorneys' fees.

## I. BACKGROUND

CPRR is a California corporation "engaged in the business, inter alia, of locating and retrieving public records and has, in the course of its business, located and obtained copies of public records throughout the State of California including records maintained by [the County.]" According to the petition, CPRR "has lobbied for wider access by the public to public records and otherwise sought to promote the interests of the general public regarding access to public information and the fees charged therefor."

The Recorder's Office processes and maintains the County's public records, including real property records (e.g., deeds, deeds of trust, liens, and maps), vital records (e.g., marriage, birth, and death certificates), and other official records (e.g., professional registrations). The Recorder's Office strives "to preserve and provide for the public a true and reliable, readily accessible permanent account of real property and other official records and vital human events, both historic and current."

The Recorder's Office maintains more than 200 different kinds of public records. Members of the public may obtain copies of these records for a fee. From 1951 through 1992, former section 27366 established a statutory copy fee of $1.00 for the first page

3

and $0.50 for each subsequent page. (Former § 27366.)[2] In 1993, the Legislature amended section 27366, repealing the statutory copy fee and requiring boards of supervisors to set fees "in an amount necessary to recover the direct and indirect costs of providing the product or service or the cost of enforcing any regulation for which the fee or charge is levied." (§ 27366.) As we shall discuss, the present dispute turns on the meaning of the phrase "direct and indirect costs."

A.      *The Fee Studies*

In 2007, the County retained independent consultants Government Finance Research (GFR) and Peter Lauwerys to conduct a fee study. GFR and Lauwerys had previously completed similar studies for thirty-one other counties throughout California. The GFR study suggests a methodology for calculating fees for services offered by the Recorder's Office, which we shall describe momentarily. The GFR study served as the basis for a subsequent study, referred to by the parties as the "in-house fee study." The in-house fee study was prepared by the Recorder's Office in May 2009 using the methodology set forth in the GFR study.

The in-house fee study proposes a fee schedule for services offered by the Recorder's Office, including copy services, using a staff billing rate of $129.88 per hour, or $2.16 per minute. The in-house fee study calculates fees by multiplying the staff billing rate by the average time required to perform a given service. For example, the in-house fee study indicates that copy requests require an average of four minutes and 30

---

[2] Former section 27366 provided, "The fee for any copy of any other record or paper on file in the office of the recorder, when the copy is made by the recorder, is one dollar ($1) for the first page and fifty cents ($0.50) for each additional page or portion thereof; provided, that page does not exceed 11 by 18 inches. The fee for photographic copies of pages exceeding 11 by 18 inches shall be one dollar and fifty cents ($1.50) for the first page and 80 cents ($0.80) for each additional page or portion thereof."

seconds of staff time for the first page, and one minute for each subsequent page.[3]
Applying the staff billing rate of $2.16 per minute, the in-house fee study recommends
that copy fees be $10.00 for the first page ($2.16 per minute multiplied by 4.5 minutes
equals $9.72, rounded to the nearest dollar) and $2.00 for each subsequent page ($2.16
per minute multiplied by one minute, rounded to the nearest dollar). As we shall discuss,
CPRR challenges the manner in which the GFR study and in-house fee study (together,
the fee studies) calculate the staff billing rate.

The staff billing rate was calculated by aggregating costs associated with offering
services to the public. These costs fall into seven broad categories: (1) individual staff
salaries, (2) office overhead, (3) services and supplies, (4) management and supervision,
(5) information technology support, (6) cost studies, and (7) computer equipment. For
each of the foregoing categories, an hourly rate was calculated using a concept known as
the "productive hour."

According to the GFR report, " 'Productive Hours' are those hours that a worker
can be considered to be 'on the job' in the work place." Thus, an employee's productive
hours equal the sum of their annual hours (i.e., 40 hours per week times 52 weeks per

---

[3] The in-house fee study indicates that copy requests typically involve several steps, each
of which demands staff time. When a member of the public goes to the Recorder's
Office to obtain a copy of an official record, a staff member typically directs her to a
computer kiosk where she can search for the appropriate document number. This
process, which includes instruction on the use of the computer kiosk, consumes an
average of two minutes of staff time. The staff member then returns to his work station,
where he locates and prints the document (thirty seconds), reviews the document with the
member of the public (one minute), and processes her payment (one minute). The in-
house fee study indicates that subsequent pages require additional time to locate and print
(fifteen seconds), review with the member of the public (thirty seconds), and process for
payment (fifteen seconds). Thus, the in-house fee study concludes that copy requests
consume an average of four minutes and 30 seconds of staff time for the first page, and
an additional one minute of staff time for each subsequent page.

5

year), less vacation, sick leave, holidays, and breaks. The GFR study opines that an average employee at the Recorder's Office logs 1,640 productive hours a year. Assuming an average salary of $71,908.67 per year, the cost of individual staff salaries amounts to $43.85 per productive hour ($71,908.67, divided by 1,640, equals $43.85). The in-house fee study uses a similar methodology to calculate a cost per productive hour for each of the other categories of costs incurred by the Recorder's Office (e.g., office overhead, service and supplies), which are then aggregated to arrive at the staff billing rate. These calculations are summarized below:

|  | COST PER HOUR |
|---|---|
| 1. Individual staff salaries, including benefits | $43.85 |
| 2. Office overhead | $14.17 |
| 3. Services and supplies | $30.30 |
| 4. Management and supervision | $22.61 |
| 5. Information technology support | $4.76 |
| 6. Cost studies | $3.02 |
| 7. Computer equipment | $11.18 |
| **Total** | $129.88 |

As the table illustrates, the staff billing rate captures *all* of the costs involved in providing services to the public, both direct and indirect.[4] Because the staff billing rate reflects direct and indirect costs, and because the staff billing rate was used to calculate proposed copy fees, the proposed copy fees also reflect the direct and indirect costs of providing copies to the public. Put another way, the in-house fee study proposes copy fees that not only recoup the direct cost of making copies (such as the cost of running the copy machine), they also recoup a share of the indirect costs incurred in the day-to-day operation of the Recorder's Office, such as staff salaries and overhead.

---

[4] We consider the meaning of these terms below.

*B.*     *The Master Fee Resolution*

The fee studies were reviewed and approved by Douglas K. Olander, a certified public accountant with almost 36 years of experience, including 12 years as the manager for cost accounting and budget for the Auditor-Controller's Office. The proposed copy fees were then incorporated into an eight-page chart entitled "Proposed Changes to the Master Fee Schedule." The chart sets forth approximately 200 proposed fees for various services offered by nine different county departments, including the proposed copy fees for the Recorder's Office ($10.00/$2.00). The chart is attached as an exhibit to the agenda for the May 19, 2009, meeting of the Board. Neither the GFR study nor the in-house fee study is attached as an exhibit to the agenda.

The agenda explains that the Board sets fees by means of a "master fee resolution," a single resolution and integrated fee schedule which allows the Board to systematically review and establish fees for all departments. The Board adopted master fee resolution No. 09-71 on May 19, 2009 (MFR), thereby setting the copy fees charged by the Recorder's Office at the challenged rate of $10.00/$2.00.

*C.*     *CPRR Buys Copies and Brings Suit*

CPRR purchased copies of two recorded documents from the Recorder's Office on July 8, 2011. One of the documents was two pages long and one was 21 pages. The Recorder's Office charged CPRR $62.00, consistent with the $10.00/$2.00 rate.

CPRR commenced the instant action on November 21, 2011. CPRR's verified second amended petition for writ of mandate and declaratory relief and complaint for damages, which is the operative pleading, alleges six causes of action. First, CPRR seeks a writ of mandate on the ground that the County violated a mandatory duty to limit copy fees. Specifically, CPRR alleges the County violated a duty "to limit the amount of fees charged for copies of recorded documents to recoupment of direct and indirect costs actually incurred in producing copies." Second, CPRR seeks a writ of mandate on the ground that the Board abused its discretion in setting copy fees. Specifically, CPRR

7

alleges the Board lacked a reasonable basis for setting copy fees, and abused its discretion by setting fees which seek to recover indirect costs that cannot be specifically associated with the production of copies. Third, CPRR seeks a writ of mandate on the ground that the County violated "a mandatory duty to enact special taxes only by vote of the electorate" under Proposition 26 when the Board adopted the MFR. Fourth, CPRR seeks a declaration of the parties' rights under section 27366, and a further declaration that the Recorder's direct and indirect costs to produce copies do not exceed $0.10 per page. Fifth, CPRR alleges that the County was negligent in setting copy fees, and seeks damages on behalf of a putative class of persons who purchased copies at the challenged rate after March 23, 2011. Finally, CPRR alleges a cause of action for money had and received on behalf of the same putative class.

The County demurred to the petition and complaint on various grounds. Among other things, the County argued that CPRR's negligence cause of action is barred by section 815, subdivision (a). The trial court (Maguire, J.) overruled the demurrer in its entirety. With respect to the negligence cause of action, the trial court concluded, "[the County] does not demonstrate that [section 27366] may not properly provide a basis for liability under [section 815.6]." The County answered the petition and complaint and the parties proceeded with discovery.

*D.      The County Requests a New Trial Date and Reduces Copy Fees*

On April 25, 2014, CPRR's counsel, Donald W. Ricketts, sent the County's counsel, Eric May, a written settlement offer. On April 30, 2014, May emailed Ricketts, acknowledging the offer and requesting a two-month extension of the trial date and concomitant extension of the upcoming summary judgment deadline. May wrote, "I am concerned that the deadline may not allow us to engage in meaningful settlement discussions and rush us in the litigation." Ricketts agreed to continue the trial date.

On July 10, 2014, the County, through outside counsel, sent CPRR's counsel, Donald W. Ricketts, a letter stating: "This letter serves as a courtesy notice to let you

know that due to the recent retirement of some of the senior staff members at the [Recorder's Office], an overall decrease in the total salary cost of the office has resulted. Therefore, the first page copy fee for recorded documents has been reduced from $10.00 to $7.35. The copy fee for each subsequent page remains unchanged at $2.00 per page." The letter indicates that the fee reduction was effectuated by means of "Resolution No. 14-41," which was apparently presented to the Board and adopted on April 29, 2014, the day before May's email requesting an extension of time. Ricketts did not know that the Board had approved the new copy fees prior to receiving the letter.

E.      *The County's Motion for Summary Judgment*

On July 30, 2014, the County moved for summary judgment on the grounds, inter alia, that section 27366 authorizes the Board to exercise discretion in setting fees, the Board properly exercised its discretion, and fees were reasonably related to the cost of producing copies. The County also argued that CPRR's causes of action for negligence and money had and received were barred by the Act, and the petition was moot in view of the recent decision to reduce copy fees to $7.35/$2.00.

The County's motion was supported by a declaration from Chief Deputy Clerk-Recorder Jeffrey M. Barry. Barry's declaration describes the fee studies, and offers additional information regarding the costs involved in the day-to-day operation of the Recorder's Office. For example, Barry explains that the Recorder's Office incurs numerous costs associated with the digitalization of the official record, which is maintained on microfilm.

According to Barry, the Recorder's Office spends approximately $52,250 per year to license software to digitalize recorded documents. The Recorder's Office also spends money to maintain its computer servers, store and maintain digital images of official records dating back to 1970, maintain an electronic copy of the general index on the Recorder's website, and purchase and maintain scanners, computers, and printers.

9

The County's motion was also supported by a declaration from Olander. As noted, Olander reviewed and approved the fee studies. Olander offers excerpts from federal and state accounting guidelines (which we shall discuss shortly), and opines that "the 'productive rate' or 'billing rate' methodology . . . [is] a sound and appropriate accounting methodology commonly used in accounting practice to allocate a pro rata share of direct and indirect costs to a specific product or service." According to Olander, "This method is taught in basic accounting courses, and implemented by industry, academia, non-profits, and governmental entities."

CPRR opposed the motion, arguing that section 27366 imposes "mandatory limits" on copy fees, which the County violated by setting fees in amounts designed to recover "costs for recording documents and for 'maintenance of the entire real estate recording system.'" Relying solely on the allegations in the petition and complaint, CPRR argued that the Recorder's copy fees improperly seek to recover costs for time that was not actually spent making copies. CPRR also argued that the Recorder's copy fees were "per se unreasonable and a special tax within the meaning of [article XIIIC]" because they allegedly violated sections 27360 and 27366. (Italics omitted.)

CPRR also argued that the Board lacked a reasonable basis for setting copy fees because (1) the Yolo County Administrator (County Administrator) incorrectly advised the Board that "proposed increased fees for copies of recorded documents recouped 'the actual costs of providing' copies," and (2) the County Administrator failed to provide the Board with copies of the fee studies. Again, CPRR relied solely on the allegations in the petition and complaint.

CPRR also argued the Board abused its discretion in setting copy fees because (1) the GFR study erroneously relies on section 54985 and Office of Management and Budget Circular A-87 (OMB A-87) in setting copy fees (Off. of Management and Budget, Circular A-87, 46 Fed.Reg. 9548 (Jan. 28, 1981)), (2) the methodology used in the GFR study was flawed, and (3) Lauwerys was not qualified to conduct the GFR

10

study. CPRR also argued that Olander failed to comprehensively review the fee studies. CPRR did not offer any expert evidence to refute the fee studies.

CPRR also denied the County was immune from liability under the Act, noting that Judge Maguire had previously overruled the County's demurrer on immunity grounds. Finally, CPRR denied the petition was moot, noting the County's fee reduction did not reach the second page fee, and "that fee, which boosts the cost of multiple-page documents to astronomical heights, is still clearly at issue."

The trial court (White, J.) published a tentative ruling granting the County's motion. CPRR did not contest the tentative ruling, which became the order of the court. In the order, the trial court concluded that (1) CPRR failed to establish that the County violated a mandatory duty, (2) the County established that the copy fees were "founded on evidentiary support and were not arbitrary or capricious," (3) CPRR failed to establish that the copy fees exceeded the reasonable cost to the County of providing copies, (4) the County established that CPRR was not entitled to declaratory relief, and (5) the County established immunity with respect to CPRR's causes of action for negligence and money had and received. The trial court refused to consider CPRR's unsupported factual allegations. Accordingly, the trial court granted the motion and entered judgment in the County's favor.

*F.     CPRR's Motion for Attorneys' Fees*

Following summary judgment in the County's favor, CPRR filed a motion seeking more than $450,000 in attorneys' fees pursuant to Code of Civil Procedure section 1021.5. The motion argued that CPRR's lawsuit was the catalyst for the County's fee reduction, which conferred a significant benefit on members of the public seeking copies of official records. The motion also argued that the County's request to continue the trial date was part of a "ploy" designed to moot CPRR's case. The motion was supported by a declaration from Ricketts. In the declaration, Ricketts claimed he spent 461.7 hours on the litigation and opined that the market rate for an attorney of comparable skill and

11

experience was $650 an hour. Ricketts also suggested that a 1.5 multiplier of the lodestar amount was appropriate in view of the complexity of the case. Ricketts attached copies of "contemporaneously made notations of time expended on this matter," consisting of terse, and extensively abbreviated entries (e.g., "TC Client").

The County opposed the motion, arguing that CPRR failed to obtain the primary relief sought in the case. The County observed that CPRR originally sought a writ of mandate requiring the County to reduce copy fees to 10 cents a page, an objective CPRR did not come close to meeting. Relying on another declaration by Chief Deputy Clerk-Recorder Barry, the County noted that the new copy fees were calculated using the same methodology as the old fees. According to Barry, "The County used the same formulas as in 2009; it included the same direct and indirect costs as in 2009; and based its calculations on the work of the same consultant as in 2009. The difference was largely the result of changed labor costs, after senior staff members retired and [were] replaced by more junior members who had lower salary costs."

The County denied having reduced copy fees in response to CPRR's lawsuit, denied that CPRR's causes of action were meritorious, and denied that CPRR made a reasonable attempt to settle the case without litigation. The County also objected to Ricketts' declaration, arguing that the claimed market rate of $650 per hour lacked foundation and the time entries were hearsay not within any exception. The County also challenged the substance of the time entries, noting that they appeared to contain numerous errors, including (1) time spent on other matters, (2) double counting of certain tasks, and (3) vague or incomplete descriptions of tasks.

The trial court published a tentative ruling denying the motion for attorneys' fees, which was uncontested, and became the order of the court. In the order, the trial court sustained the County's objections to Rickett's declaration and denied the motion, stating: "[CPRR] does not establish that it is entitled to recover its attorneys' fees under the catalyst theory of [Code of Civil Procedure] section 1021.5. Even if [CPRR] were

12

entitled to recover attorneys' fees under [Code of Civil Procedure] section 1021.5, it has offered no admissible evidence to support the fee request."

CPRR filed a timely notice of appeal.

## II. DISCUSSION

We first address the County's motion for summary judgment, and then consider CPRR's motion for attorneys' fees.

A.    *Summary Judgment*

1.    *Standard of Review*

Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civil. Proc., § 437c, subd. (c).) A defendant moving for summary judgment meets "his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (*Id*. at subd. (p)(2).) Once the moving party has met its initial burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (*Ibid.*)

We review the trial court's grant of summary judgment de novo, independently evaluating the correctness of the trial court's ruling and applying the same legal standards as the trial court. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) In so doing, we consider all of the evidence offered by the parties in connection with the motion, except that which the trial court properly excluded. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) Here, the facts are essentially undisputed, raising questions of law requiring statutory interpretation. Such questions of statutory construction are also reviewed de novo. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

13

*2.     Section 27366*

We begin with an analysis of section 27366, a statute that, until recently, had not been addressed in any previous published appellate court decision.[5]  Section 27366 provides:  "The fee for any copy of any other record or paper on file in the office of the recorder, when the copy is made by the recorder, shall be set by the board of supervisors in an amount necessary to recover the direct and indirect costs of providing the product or service or the cost of enforcing any regulation for which the fee or charge is levied."[6]  As we shall discuss, the parties' dispute centers on the meaning of "indirect costs," a term which is not defined in the statute.

CPRR challenges the County's right to recover overhead and other operating costs under section 27633, claiming the County can only recover indirect costs reasonably related to the actual production of copies.  CPRR contends the County impermissibly seeks to recover overhead and other operating costs that would be incurred whether or not the Recorder's Office produces copies, in violation of "mandatory limits" established by

---

[5] The Fifth Appellate District recently considered section 27366 in *California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432 (*Stanislaus*), a case bearing significant similarities to the case before us.  We note one crucial factual difference, however.  In *Stanislaus,* the county's fee study considered copy costs on a per document basis, rather than a per page basis.  (*Id.* at p. 1436.)  As a result, the court concluded, "there was an apples-versus-oranges-type disconnect between the 2001 study's application of the time-based methodology to estimate *per document* costs and its recommendation to impose copying fees on a *per page* basis."  (*Id.* at p. 1449.)  There is no such "disconnect" on the record before us, as the County's fee study appropriately considers costs on a per page basis.

[6]  We presume that section 27366's reference to "any other record or paper on file" refers to records or papers other than copies of vital statistics certificates, which are separately provided for in the immediately preceding section.  (See § 27365 ["The fee for any copy of a birth, death, or marriage certificate, when the copy is made by the recorder, is the same as is payable to a state or local registrar of vital statistics].)

14

section 27366 and California common law. According to CPRR, such costs are not recoverable because they are not related to the actual production of copies.

The County responds that section 27366 authorizes the County to recover a wide range of direct and indirect costs, including overhead and operating costs incurred by the Recorder's Office generally. The County contends the term "indirect costs" embraces the overhead and operating costs sought to be recovered here. According to the County, members of the public who request copies of official records can and should be "responsible for a portion of the overall cost of providing the service, including the costs of daily operations, equipment for retrieving the records, and the supervision and management of the office operations and staff directly and indirectly associated with providing the service."

The parties' contentions require us to interpret section 27366. In so doing, we apply familiar principles of statutory construction. As our Supreme Court has explained, " '[O]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] In this search for what the Legislature meant, '[t]he statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Martinez v. Combs* (2010) 49 Cal.4th 35, 51.)

Here, we need look no further than the words of the statute. As noted, section 27366 authorizes the Board to set copy fees "in an amount necessary to recover the direct

15

and indirect costs of providing the product or service." [7] (§ 27366.) Section 27366 does not define the phrase, "direct and indirect costs." (*Ibid*.) However, these terms have established and generally accepted meanings in the context of fee setting legislation. Indeed, the term "direct costs" has been judicially defined in another copy fees case, *North County Parents Organization v. Dept. of Education* (1994) 23 Cal.App.4th 144 (*North County*). We survey the established meanings of the terms "direct costs" and "indirect costs" below.

### a. Dictionary Definitions

"The dictionary is a proper source to determine the usual and ordinary meaning of words in a statute." (*Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1251; see also *Wasatch Prop. Mgmt. v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition"].) For our purposes, the relevant dictionary definitions are the ones in place when the statute was adopted. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570, fn. 4 (*Graham*) ["the definition that should be consulted is not from the most recent edition of the dictionary, but the one current when the Legislature adopted" the statute in question].) [8]

---

[7] Alternatively, the Board may set fees "in an amount necessary to recover . . . the cost of enforcing any regulation for which the fee or charge is levied." (§ 27366.) We focus on "the direct or indirect costs of providing the product or service," (*ibid*.) as the Board relied on this provision in setting fees.

[8] The County requests that we take judicial notice of *current* definitions of "indirect costs." CPRR objects to the County's request on the grounds that the County's definitions constitute "inadmissible hearsay."

We decline the County's request because, as indicated in the text, "relevant dictionary definitions are those extant before or at least near in time to the statutory or contractual usage." (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237

16

As noted, the current version of section 27366 was adopted in 1993. (Stats. 1993, ch. 710, § 3, p. 4039.) At the time, Black's Law Dictionary defined the term "direct costs" as "Costs of direct material and labor, and variable overhead incurred in producing a product." (Black's Law Dict. (6th ed. 1990) p. 459, col. 2.) Black's Law Dictionary defined the term "indirect costs" as "Costs not readily identifiable with production of specific goods or services, but rather applicable to production activity in general; *e.g.,* overhead allocations for general and administrative activities." (*Id.* at p. 346, col. 2.)

Similarly, Webster's Third New International Dictionary defined "direct cost" as "a cost that may be computed and identified directly with a product, function, or activity and that [usually] involves expenditures for raw materials and direct labor and sometimes specific and identifiable items of overhead – contrasted with indirect cost." (Webster's Third New Internat. Dict. (1993) p. 640, col. 3.) Webster's Third New International Dictionary defined "indirect cost" as "a cost that is not identifiable with a specific product, function, or activity." (*Id*. at p. 1151, col. 3.)

These definitions, though not dispositive, strongly suggest that the Legislature intended to adopt a broad definition of the phrase "direct and indirect costs." As we shall discuss, these definitions are also consistent with the terminology used by the California State Controller's Office and federal Office of Management and Budget.

b.      *State and Federal Accounting Guidelines*

---

Cal.App.4th 411, 433.) Nevertheless, we take judicial notice sua sponte of the definitions in place during the relevant period. (Evid. Code, § 451, subd. (e) [judicial notice shall be taken of "[t]he true signification of all English words and phrases and of all legal expressions"].) We overrule CPRR's anticipated hearsay objection, noting that such definitions are aids to the court's understanding, not evidence. (*Nix v. Hedden* (1893) 149 U.S. 304, 307 [taking judicial notice of meaning of English words and emphasizing that, "upon such a question dictionaries are admitted, not as evidence, but only as aids to the memory and understanding of the court"].)

17

By statute, the Controller is required to prescribe uniform accounting procedures for counties (§ 30200), and provide each county with a manual of accounting procedures known as the State Controller's Manual of Accounting Standards and Procedures for Counties (the Manual) (Cal. Code Regs., tit. 2, § 904).  The Manual incorporates accounting standards established by the Governmental Accounting Standards Board, which has the authority to issue generally accepted accounting principles for state and local governments.  (See State Controller's Off. Manual of Accounting Standards and Procedures for Counties (May 1992) p. i.)

The Manual defines "direct costs" as "direct expenses," which are, in turn, defined as, "Expenses specifically traceable to specific goods, services, units, programs, activities, or functions."  (State Controller's Off. Manual of Accounting Standards and Procedures for Counties, *supra,* at p. C.19.)  According to the Manual, "Direct expenses differ from indirect expenses in that the latter cannot be specifically traced and so must be allocated on some systematic and rational basis."  (*Ibid*.)  The Manual defines indirect charges/costs/expenses as "overhead," which is, in turn, defined as "Those elements of cost necessary in the production of a good or service which are not directly traceable to the product or service.  Usually these costs relate to objects of expenditure which do not become an integral part of the finished product or service, such as rent, heat, light, supplies, management and supervision."  (*Id.* at pp. C.30 and C.38.)

The federal Office of Management and Budget attaches similar meanings to the terms "direct costs" and "indirect costs," both of which are defined in OMB A-87.  (Off. of Management and Budget, Circular A-87, 46 Fed.Reg. 9548*, supra,* §§ E(1) and F(1).)  According to OMB A-87, "Direct costs are those that can be identified specifically with a particular cost objective."  (*Id.* at § E(1).)  By contrast, "Indirect costs are those (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefited, without effort disproportionate to the results achieved."  (*Id.* at § F(1); see also State Controller's Office

18

Handbook of Cost Plan Procedures for California Counties (Oct. 2012) Part II, § 2410, p. 74 [same].)

These definitions, which the Legislature is presumed to have known and intended, also support the County's view that section 27633 authorizes the Board to recover overhead and other operating costs that cannot be specifically associated with the production of copies. (*People v. Carter* (1996) 48 Cal.App.4th 1536, 1540 ["Ordinarily words used in a statute are presumed to be used in accordance with their established legal or technical meaning"]; see also 2A Singer and Singer, Statutes and Statutory Construction (2007 7th ed.) § 47:29, p. 474 ["In the absence of legislative intent to the contrary, or other overriding evidence of a different meaning, technical terms or terms of art used in a statute are presumed to have their technical meaning [fns. omitted]"].)

>           c.        *Statutory Definitions and Related Statutory Usages*

The County's expansive interpretation of section 27366 finds further support in statutory definitions and related statutory usages of the terms "direct costs" and "indirect costs." (*In re Bittaker* (1997) 55 Cal.App.4th 1004, 1009 ["To understand the intended meaning of a statutory phrase, we may consider use of the same or similar language in other statutes, because similar words or phrases in pari materia [(that is, dealing with the same subject matter)] ordinarily will be given the same interpretation"].)

For example, Health and Safety Code section 25206.1 (part of the Hazardous Waste Control Law, Health & Saf. Code, § 25100 et seq.), adopted just a few years after section 27633 (see Stats. 1997, ch. 870, § 31, p. 6290), defines the term "direct costs" as "the costs to the [Department of Toxic Substances Control] of processing applications, responding to requests, or providing other services . . . that can be specifically attributed to a particular cost objective, including, but not limited to, sites, facilities, and activities." (Health & Saf. Code, § 25206.1, subd. (a).) By contrast, Health and Safety Code section 25206.1 defines the term "indirect costs" as "the costs to the [Department of Toxic Substances Control] of activity that is of a common or joint purpose benefiting more than

19

one cost objective and not readily assignable to a single cost objective." (Health & Saf. Code, § 25206.1, subd. (b).)

A more recent statute, Education Code section 33338, which was enacted in 2012 and deals with grants or allocations of state funds to school districts (Stats. 2012, ch. 587, § 3, amended by Stats. 2015, ch. 344, § 3), defines the term "direct cost" as "a cost that provides measurable, direct benefits to a particular program of an agency." (Ed. Code, § 33338, subd. (b)(1).) "Direct costs of a local educational agency include, but are not necessarily limited to, salaries and benefits of teachers and instructional aides, costs for purchasing textbooks and instructional supplies, and costs for providing pupils with counseling, health services, and transportation." (*Ibid.*) By contrast, Education Code section 33338 defines the term "indirect costs" as "the agencywide, general management cost of the activities for the direction and control of the agency as a whole." (*Id*. at subd. (b)(2).) "Indirect costs include, but are not necessarily limited to, administrative activities necessary for the general operation of the agency, such as accounting, budgeting, payroll preparation, personnel services, purchasing, and centralized data processing." [9] (*Ibid.*)

---

[9] Other statutes offer similar examples of "indirect costs." For instance, Health and Safety Code section 104510, enacted in 1995 as part of the Cigarette and Tobacco Surtax Medical Research Program (Stats. 1995, ch. 415, § 5, p. 2543, amended by Stats. 2009, ch. 386, § 29), provides, in part, that, " 'Indirect costs' includes such items as use allowance for research facilities, heating, lighting, library services, health and safety services, project administration, and building maintenance." (Health & Saf. Code, § 104510, subd. (b).)

Similarly, Welfare and Institutions Code section 4681.1, which was enacted in 1988 and amended in 1998 to add examples of "indirect costs" in the context of community care facilities (Stats. 1988, ch. 85, § 2, p. 384, amended by Stats. 1998, ch. 1043, § 10, p. 7988), provides that " 'Indirect costs' include managerial personnel, facility operation, maintenance and repair, other nondirect care, employee benefits, contracts, training, travel, licenses, taxes, interest, insurance, depreciation, and general administrative expenses." (Welf. & Inst. Code, § 4681.1, subd. (a)(1).)

These statutory definitions are consistent with the generally accepted meanings of the terms "direct costs" and "indirect costs," and demonstrate that the Legislature was aware of the potentially broad meaning of the phrase "direct and indirect costs" when it amended section 27366.

Other statutes demonstrate that the Legislature knew how to limit recoverable costs when it wished to do so. For example, former section 6257 (repealed by Stats. 1998, ch. 620, § 10, p. 4121), now section 6253 (Stats. 1998, ch. 620, § 5, p. 4120) of the California Public Records Act authorizes public agencies to charge "fees covering direct costs of duplication." (§ 6253, subd. (b).) The statute does not define the phrase "direct costs of duplication." (§ 6253) However, the Court of Appeal for the Fourth Appellate District, Division One, considered the meaning of the phrase in *North County.* (*North County, supra,* 23 Cal.App.4th at pp. 146-148.) There, the plaintiff, a nonprofit organization, requested copies of all decisions rendered by the defendant, the California Department of Education (Department) over a two year period. (*Id.* at p. 146.) The Department charged $0.25 per page for the copies, resulting in a total bill of $126.50. (*Ibid.*) The Department's copy fee not only covered the actual cost of making copies, it also reimbursed the Department for staff time required to locate, review, and redact the requested records. (*Ibid.*)

The plaintiff brought an action seeking "miscellaneous relief." (*North County, supra,* 23 Cal.App.4th at p. 146.) The trial court determined that the Department's copy fees were permissible, and the court of appeal reversed, stating: "We sometimes presume too much of the Legislature, but this is assuredly not the case when we presume that the statute writers, themselves bureaucrats of a sort, knew the ancillary costs of everything government does. They specified, however, that the sole charge should be that for duplication. In order to clarify this limitation the Legislature added that the fee should be the 'direct cost' of duplication. Obviously to be excluded from this definition would be 'indirect' costs of duplication, which presumably would cover the types of costs the

21

Department would like to fold into the charge." (*Id.* at p. 147.) Applying this reasoning, the court concluded: "The direct cost of duplication is the cost of running the copy machine, and conceivably also the expense of the person operating it. 'Direct cost' does not include the ancillary tasks necessarily associated with the retrieval, inspection and handling of the file from which the copy is extracted." (*Id.* at p. 148.) Accordingly, the court rejected the Department's attempt to recover staff time. (*Ibid.*)

We recognize that the Legislature could not have been aware of *North County* when it amended section 27366. Nevertheless, the *North County* court's interpretation of former section 6257 confirms that the Legislature knew how to limit recoverable costs.

Another statute that governs fee setting by local governments, section 54985, confirms that the Legislature knew how to limit recoverable *indirect* costs. Enacted in 1983, section 54985 provides in pertinent part: "Notwithstanding any other provision of law that prescribes an amount or otherwise limits the amount of a fee or charge that may be levied by a county, a county service area, or a county waterworks district governed by a county board of supervisors, a county board of supervisors shall have the authority to increase or decrease the fee or charge, that is otherwise authorized to be levied by another provision of law, in the amount reasonably necessary to recover the cost of providing any product or service or the cost of enforcing any regulation for which the fee or charge is levied. The fee or charge may reflect the average cost of providing any product or service or enforcing any regulation. *Indirect costs that may be reflected in the cost of providing any product or service or the cost of enforcing any regulation shall be limited to those items that are included in [OMB A-87].*" (§ 54985, subd. (a), italics added; *County of Orange v. Barratt American, Inc.* (2007) 150 Cal.App.4th 420, 434.) OMB A-87 attaches a non-exclusive list of "allowable costs," ranging from "Accounting" to "Travel." (Off. of Management and Budget, Circular A-87, 46 Fed.Reg. 9548, *supra,*, Att. B, § B.)

By its express terms, however, section 54985 does not apply to "[a]ny fee charged or collected by a county recorder or local registrar for filing, recording, or indexing any document, performing any service, issuing any certificate, *or providing a copy of any document* pursuant to [section 27366]." (§ 54985, subd. (c)(6), italics added.) Nevertheless, section 54985 demonstrates that, when the Legislature wants to limit indirect costs, it expressly says so. Despite close parallels to section 54985, section 27366 contains so such limitation. We therefore presume that no such limitation was intended. (See *Hoschler v. Sacramento City Unified School Dist.* (2007) 149 Cal.App.4th 258, 269 [" 'Where the Legislature omits a particular provision in a later enactment related to the same subject matter, such deliberate omission indicates a different intention which may not be supplanted in the process of judicial construction.' [Citation.]"].)

Having concluded that the Legislature deliberately omitted any reference to OMB A-87 in amending section 27366, we further conclude that section 27366 authorizes the Board to consider a wider range of indirect costs than section 54985. Put another way, we conclude that section 54985 is more restrictive than section 27366, not less. We therefore reject CPRR's contention that the amendments to section 27366 were intended to limit recoverable indirect costs. To the contrary, the overall statutory scheme suggests the Legislature intended to give boards of supervisors greater flexibility in identifying indirect costs associated with the production of copies. (See *In re Marriage of Harris* (2004) 34 Cal.4th 210, 222 ["we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness' "].)

These statutory definitions and related uses of the terms "direct costs" and "indirect costs" support the County's expansive interpretation of section 27366, and indicate the Legislature intended for boards of supervisors to consider a wide range of indirect costs in setting copy fees, including overhead and other operating costs not specifically associated with the actual production of copies. We have no reason to

23

believe the Legislature intended the term "indirect costs" to have a different meaning here. (*Scottsdale Ins. Co. v. State Farm Mutual Automobile Ins. Co.* (2005) 130 Cal.App.4th 890, 899 ["As a rule, 'unless a contrary intent appears,' we presume the Legislature intended that we accord the same meaning to similar phrases. [Citation.] Similarly, if a word or phrase has a particular meaning in one part of a law, we give it the same meaning in other parts of the law"]; *Balasubramanian v. San Diego Community College Dist.* (2000) 80 Cal.App.4th 977, 988 ["We must construe identical words in different parts of the same act or in different statutes relating to the same subject matter as having the same meaning"].) Certainly, nothing in the language of the statute suggests the Legislature intended to adopt the narrow construction CPRR proposes, which, by limiting the County to "recoupment of direct and indirect costs actually incurred in producing copies," would contradict dictionary, statutory and technical definitions of the term "indirect costs." (See, e.g., Black's Law Dict. (6th ed. 1990) p. 346, col. 2 [defining "indirect costs"]; Ed. Code, § 33338, subd. (b)(2) [same]; State Controller's Off. Manual of Accounting Standards and Procedures for Counties, *supra,* at pp. C.30 and C.38 [same].)

Against this background, we conclude the term "indirect costs" has an established and generally accepted meaning in the context of governmental accounting and fee setting legislation, and includes overhead and operating costs not specifically associated with the production of copies. We therefore conclude that the plain meaning of section 27366 unambiguously authorizes—indeed, *requires*—the Board to set copy fees in an amount necessary to recover overhead and other operating costs incurred in the day-to-day operation of the Recorder's Office. (§ 27366 ["The fee for any copy of any other record or paper on file in the office of the recorder . . . *shall be set* by the board of

24

supervisors in an amount necessary to recover the direct and indirect costs of providing the product or service" (italics added)].)[10]

CPRR challenges this conclusion in two ways. First, CPRR contends the applicable legislative history indicates the Legislature intended to cap copy fees by limiting recoverable costs. Second, CPRR claims article I, section 3, subdivision (b)(2) of the California Constitution requires us to construe section 27633 narrowly. We address these arguments in reverse order below.

        d.       *CPRR's Reliance on Article I, Section 3, Subdivision (b)(2) of the California Constitution is Misplaced*

In 2004, California voters passed Proposition 59, known as the "Sunshine Initiative," which amended article I, section 3 of the California Constitution by adding subdivision (b). (Cal. Const., art. I, § 3, subd. (b); *POET, LLC v. California Air Resources Bd.* (2013) 218 Cal.App.4th 681, 750.) Subdivision (b)(1) states that the "people have the right of access to information concerning the conduct of the people's business . . . ." (Cal. Const., art. I, § 3, subd. (b), par. (1).) Subdivision (b)(2) provides in pertinent part: "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (*Id*. at subd. (b), par. (2).)

By its terms, subdivision (b)(2) expresses an interpretive rule for cases dealing with the people's right of access. (Cal. Const., art. I, § 3, subd. (b), par. (2).) As one court has explained, "when a court is confronted with resolving a statutory ambiguity related to the public's access to information, the California Constitution requires the court

---

[10] The Fifth Appellate District reached a different conclusion in *Stanislaus*. In that case, the court concluded that "the term 'indirect costs' is ambiguous because it does not have a single, plain meaning." (*Stanislaus, supra,* 246 Cal.App.4th at p. 1455.) We respectfully disagree for the reasons stated herein.

25

to construe the ambiguity to promote the disclosure of information to the public."
(*POET, LLC v. California Air Resources Bd., supra,* 218 Cal.App.4th at p. 750.)

CPRR argues that section 27633 fundamentally involves the public's access to information, and therefore, article I, section 3, subdivision (b)(2) of the California Constitution requires the court to construe the term "costs" narrowly. We assume without deciding that section 27633 implicates the people's right of access. (*See generally Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 164-167.) Even so assuming, we conclude article I, section 3, subdivision (b)(2) of the California Constitution does not apply.

As noted, article I, section 3, subdivision (b)(2) of the California Constitution applies "when a court is confronted with resolving a statutory ambiguity related to the public's access to information." (*POET, LLC v. California Air Resources Bd., supra,* 218 Cal.App.4th at p. 750.) Having concluded that section 27366 is unambiguous, we have no occasion to apply article I, section 3, subdivision (b)(2) of the California Constitution's interpretive rule. (*POET, LLC v. California Air Resources Bd., supra,* at p. 750.) We therefore reject CPRR's contention that article I, section 3, subdivision (b)(2) of the California Constitution requires us to disregard the established meaning of "indirect costs."

### e.    *CPRR's Resort to Legislative History is Unavailing*

Next, CPRR invites us to consider section 27366's legislative history.[11] We have no obligation to do so, as we have already concluded that section 27366 is unambiguous. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055

---

[11] According to CPRR, the applicable legislative history shows, "The Legislature clearly rejected, consistently, the recorders' requests for unlimited discretion and continued to regulate copy fees by maintaining limits on cost recoupment and the trial court erred in finding that [the County] had unlimited discretion to set the fees." Contrary to CPRR's contention, the trial court did *not* find that section 26733 vests the County with "unlimited discretion to set fees."

["Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning"].) We can, however, "look to legislative history to confirm our plain-meaning construction of statutory language." (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046; see also *Santos v. Brown* (2015) 238 Cal.App.4th 398, 425-426 ["Even though we do not resort to legislative history where a provision is unambiguous, 'courts may always test their construction of disputed statutory language against extrinsic aids bearing on the drafters' intent' "].) Here, the applicable legislative history supports the County's interpretation of section 27366, not CPRR's.[12]

From 1951 through 1992, former section 27366 established statutory copy fees at the rate of $1.00/$0.50. Section 27366 was amended by Assembly Bill No. 130 in 1993. (Stats. 1993, ch. 710, § 3, p. 4039.) The initial version of the bill would have increased the statutory copy fee from $1.00/$0.50 to $1.00 per page. (Assem. Bill No. 130 (1993-1994 Reg. Sess.) § 2, as introduced Jan. 13, 1993.) A subsequent version of Assembly Bill No. 130 would have repealed section 27366 and amended section 54985, bringing recorder's copy fees within the reach of the latter statute and subjecting them to the limitations set forth in OMB A-87. (Assem. Bill No. 130 (1993-1994 Reg. Sess.) §§ 4-5, as amended June 20, 1993.) Still another version of Assembly Bill No. 130 would have retained section 27366 and revised section 54985, thereby giving boards of supervisors authority to set copy fees, so long as they observed the limitations set forth in OMB A-87. (Assem. Bill No. 130 (1993-1994 Reg. Sess.) § 1, as amended Aug. 12, 1993.) The Legislature ultimately rejected these proposed amendments in favor of the final version, which contains no such limitation on indirect costs. (§ 26733.)

---

[12] We grant CPRR's unopposed request for judicial notice of prior versions of the applicable statutes and associated legislative history. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1127, fn. 11.)

Nothing in the applicable legislative history suggests that the Legislature intended to make section 27366 more restrictive than section 54985. If anything, the legislative history suggests the Legislature intended to give boards of supervisors more flexibility in setting fees, not less. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 130, as amended Aug. 23, 1993 ["This bill gives the counties flexibility in determining on their own what the fees will be relative to the two services (certification and copying of official records)"].) We therefore conclude that the applicable legislative history supports the County's interpretation of section 27366.

Having concluded that section 27366 authorizes the County to recover overhead and other operating costs not specifically associated with the production of copies, we now consider CPRR's claims for mandamus relief, declaratory relief and damages. As we shall discuss, our interpretation of section 27366 resolves most of these claims.

### 3. Claims for Mandamus Relief

CPRR asserts three claims for mandamus relief. First, CPRR claims the County violated a "mandatory duty under California law to limit the amount of fees charged for copies of recorded documents." Second, CPRR claims the Board abused its discretion in setting copy fees. Third, CPRR claims the County violated "a mandatory duty to enact special taxes only by vote of the electorate" under Proposition 26. We first review the requirements for a writ of mandate and then consider CPRR's claims for mandamus relief.

#### a. Requirements for Writ of Mandate

"A writ of mandate 'may be issued by any court . . . to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station . . . .' (Code Civ. Proc., § 1085, subd. (a).) The petitioner must demonstrate the public official or entity had a ministerial duty to perform, and the petitioner had a clear and beneficial right to performance. [Citations.]" (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700.)

"Generally, mandamus is available to compel a public agency's performance or to correct an agency's abuse of discretion when the action being compelled or corrected is ministerial. [Citation.] 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his [or her] own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion . . . is the power conferred on public functionaries to act officially according to the dictates of their own judgment. [Citation.]' [Citations.] Mandamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner. [Citation.]" (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health, supra,* 197 Cal.App.4th at p. 700-701.) "Mandamus may also issue to correct the exercise of discretionary legislative power, but only where the action amounts to an abuse of discretion as a matter of law because it is so palpably unreasonable and arbitrary. [Citation.]" (*Ellena v. Department of Insurance* (2014) 230 Cal.App.4th 198, 206.)

> b. *First Cause of Action (Petition for Writ of Mandate for Violation of Mandatory Duty)*

CPRR's first cause of action alleges the County violated a "mandatory duty under California law to limit the amount of fees charged for copies of recorded documents to recoupment of direct and indirect costs actually incurred in producing copies and which would be avoided if copies were not produced for the public upon request." CPRR finds support for the existence of such a duty in sections 27360 and 27366.[13]

---

[13] One of the section headings in CPRR's opening brief also suggests that CPRR finds support for the existence of a mandatory duty in section 54985. However, CPRR offers no further discussion of the point and CPRR elsewhere acknowledges that section 54985 is inapplicable. We therefore assume that CPRR's reference to section 54985 was inadvertent.

Specifically, CPRR contends, "[t]he language of sections 27360 and 27366 . . . is, explicitly, mandatory ('shall') and imposes mandatory limits."**14** We are not persuaded.

Whether sections 27360 and 27366 impose a ministerial duty, for which mandamus will lie, or a mere obligation to perform a discretionary function is a question of statutory interpretation. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health, supra,* 197 Cal.App.4th at p. 701.) " 'We examine the "language, function and apparent purpose" ' of the statute." (*Ibid.*) Although the term "shall" is defined as mandatory for purposes of the Government Code (§ 14), and appears in both sections 27360 and 27366, the term does not necessarily create a mandatory duty. "Even if mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must exercise significant discretion to perform the duty." (*Sonoma AG Art v. Department of Food & Agriculture* (2004) 125 Cal.App.4th 122, 127; see also *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 639.) Thus, in addition to examining the statutory language, we must examine the entire statutory scheme to determine whether the County has discretion to perform a mandatory duty. (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health, supra,* at p. 701.)

Here, though sections 27360 and 27366 require the Board to charge and set copy fees, the Board must exercise significant discretion in deciding how much to charge. Neither statute requires the Board to set fees in any particular amount. Rather, section 27366 requires the Board to set fees "in an amount necessary to recover the direct and indirect costs of providing the product or service." (§ 27366.) As we have discussed, section 27366 authorizes the Board to consider a wide range of indirect costs in setting fees, an undertaking which necessarily requires the exercise of significant discretion. (Cf. *County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 699 [the legislative

---

**14** Section 27360 provides, "For services performed by the recorder's office, the county recorder shall charge and collect the fees fixed in this article."

30

budget process "entails a complex balancing of public needs in many and varied areas with the finite financial resources available for distribution among those demands," and necessarily involves the exercise of discretion].) We therefore conclude that sections 27360 and 27366 do not impose a ministerial duty on the County to limit copy fees.

CPRR also argues that California common law places "mandatory limits" on recoverable costs. CPRR purports to find support for a "common law recoupment standard" in *County of Yolo v. Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242 (*County of Yolo*) and *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935 (*CAPS*). Neither of these cases establishes a mandatory duty to limit copy fees.

In *County of Yolo*, the county brought an action against various school districts alleging they failed to pay their election bills. (*County of Yolo, supra,* 5 Cal.App.4th at p. 1248.) The school districts responded with a challenge to the county's new formula for billing election costs. (*Ibid.*) Among other things, the school districts argued that the county improperly charged them for the "administrative costs" of operating the elections office. (*Id.* at p. 1247.) The term "administrative costs," which is not defined by statute, was used by the county to refer to costs associated with "maintaining and purging registered voter files; establishing and reviewing precinct lines; training poll workers; and maintaining poll sites." (*Id.* at p. 1249.)

This court carefully reviewed the applicable statutory framework for school district election costs, focusing on former Elections Code section 23524, which provides, in pertinent part: "Each district involved in a general district election in an affected county shall reimburse such county for the *actual costs* incurred by the county clerk thereof *in conducting the general district election* for that district." (former Elec. Code, § 23524, italics added, repealed by Stats. 1994, ch. 920, § 1, p. 4690; *County of Yolo, supra,* 5 Cal.App.4th at p. 1250.) Applying former Elections Code section 23524, the court concluded, "a county cannot charge a school district for the costs of election

31

functions, activities or operations the county would have to undertake or engage in regardless of whether the school district was in the election." (*County of Yolo, supra,* at p. 1258.)

Contrary to CPRR's contention, *County of Yolo* does not articulate mandatory duty or "common-law recoupment standard." In *County of Yolo*, the court simply interpreted and applied the applicable statute, without purporting to announce a common law duty or generally applicable standard for recoverable costs. Significantly, *County of Yolo* involved an entirely different statutory scheme, with different provisions and objectives than section 27366. We therefore conclude that *County of Yolo* is inapposite, despite a superficial resemblance to our case.

CPRR's reliance on *CAPS* is also misplaced. *CAPS* involved a constitutional challenge to flat fees charged by the Department of Fish and Game to cover some of its costs of meeting environmental review obligations under the California Environmental Quality Act (CEQA) and the Z'Berg-Nejedly Forest Practice Act of 1973 (Fish & Game Code, § 711.4, subds. (a)-(d); Pub. Resources Code, §§ 4511, 21000 et seq). (*CAPS, supra,* 79 Cal.App.4th at pp. 939-940.) The plaintiff, Mills, brought suit seeking a declaration that the fees constituted special taxes requiring approval by a two-thirds vote of the Legislature under article XIIIA of the California Constitution (Cal. Const., art. XIIIA (the Jarvis-Gann Property Tax Initiative or Proposition 13).) (*CAPS, supra,* at pp. 939-940.) Among other things, Mills argued that the fee was a tax "because there [was] no individual correlation between the amount of the fee and the cost of the benefit or burden." (*Id.* at p. 946.) This court disagreed, noting that "[r]egulatory fees, *unlike other types of user fees*, often are not easily correlated to a specific, ascertainable cost. This may be due to the complexity of the regulatory scheme and the multifaceted responsibilities of the department or agency charged with implementing or enforcing the applicable regulations; the multifaceted responsibilities of each of the employees who are charged with implementing or enforcing the regulations; the intermingled functions of

various departments as well as intermingled funding sources; and expansive accounting systems which are not designed to track specific tasks." (*Id.* at p. 950, italics added.)

Relying on the italicized language, CPRR observes that *CAPS* recognizes a "fundamental distinction" between "regulatory fees" and ordinary "user fees." (*CAPS, supra,* 79 Cal.App.4th at p. 952.) Taking this observation a step further, CPRR argues that regulatory fees " 'may be burdened with the full costs of the agency—administrative, overhead, wages, pensions, benefits, travel, etc. But an ordinary user fee may recoup only those costs that are related to the actual goods or services provided.' "[15] (Emphasis omitted. ) Although not clearly spelled out in its brief on appeal, CPRR appears to argue that indirect costs are not reasonably related to the cost of producing copies. We shall consider this contention later in this opinion. For present purposes, we observe that nothing in *CAPS* supports CPRR's contention that California common law establishes a mandatory duty to limit copy fees, or limits the application of section 27366. We therefore find CPRR's reliance on *CAPS* unpersuasive.

Having concluded that neither the applicable statutes nor California common law establish a ministerial duty to limit copy fees, we further conclude that the trial court properly granted the County's motion for summary adjudication of CPRR's first cause of action. (*Brierton v. Department of Motor Vehicles* (2006) 140 Cal.App.4th 427, 437 [" '[a] writ of mandamus will not lie to compel the performance of an act where no duty exists' "].)

        c.    *Second Cause of Action (Petition for Writ of Mandate for Abuse of Discretion)*

---

[15] CPRR's opening brief indicates that the above-referenced passage is a quotation from *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586, 597. However, we have not been able to find the cited language in *Isaac* or any other reported case.

33

CPRR's second cause of action alleges the Board lacked a reasonable basis for setting copy fees, and abused its discretion by setting fees that recover indirect costs that cannot be specifically correlated with the actual production of copies.[16] The trial court correctly concluded that CPRR fails to establish a viable claim for mandamus based on an abuse of discretion.

While "traditional mandate will lie to correct abuses of discretion, a party seeking review under traditional mandamus must show the public official or agency invested with discretion acted arbitrarily, capriciously, fraudulently, or without due regard for his rights, and that the action prejudiced him." (*Gordon v. Horsley* (2001) 86 Cal.App.4th 336, 351; see also *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1265 ["Mandamus may issue to correct the exercise of discretionary legislative power, *but only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law"].) CPRR fails to raise a triable issue of material fact as to whether the Board abused its discretion.

As noted, the petition alleges the Board lacked a reasonable basis for setting copy fees, and abused its discretion by setting fees to recover indirect costs that cannot be specifically correlated with the actual production of copies. On summary judgment, the County established that copy fees were calculated according to a methodology developed by independent consultants (GFR and Lauwerys) and reviewed and approved by the County's manager for cost accounting and budget for the Auditor-Controller's Office (Olander). Specifically, copy fees were calculated using a staff billing rate of $2.16 per

---

[16] On appeal, CPRR additionally argues the Board abused its discretion because (1) the proposed master fee schedule erroneously cites section 26831, rather than section 27366, as the "Code Justification," and (2) the Board erroneously relied on section 54985 in setting copy fees. These allegations do not appear in the petition, and cannot be used to create a triable issue of material fact. (*City of Hope Nat. Medical Center v. Superior Court* (1992) 8 Cal.App.4th 633, 639 ["a plaintiff opposing summary judgment may not advance a new unpleaded legal theory to defeat the motion"].)

minute. The staff billing rate reflects all known costs involved in operating the Recorder's Office. The staff billing rate was multiplied by the average time to produce copies (4.5 minutes for the first page and one minute for each subsequent page) to arrive at the rate of $10.00/$2.00.

The foregoing evidence was sufficient to carry the County's initial burden on summary judgment of showing that CPRR could not establish a claim for mandamus based on an abuse of discretion. Though reasonable minds may differ as to whether the County's methodology most closely approximates the "direct and indirect costs" of making copies, the County adequately established that the Board properly exercised its discretion in setting copy fees. (See *Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799 ["In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld"].) Accordingly, the burden shifted to CPRR to show that a triable issue of fact exists as to whether the County abused its discretion. CPRR did not carry its burden.

As noted, CPRR offered no admissible evidence demonstrating that the Board's actions were arbitrary, capricious, or lacking in evidentiary support. For example, CPRR argued the County Administrator failed to present the Board with copies of the fee studies, thereby depriving the Board of an evidentiary basis for setting fees. CPRR renews this argument on appeal. We assume for the sake of argument that the Board needed copies of the fee studies in order to make an informed decision as to the reasonableness of the proposed copy fees. Even so assuming, CPRR failed to support its argument with admissible evidence, choosing instead to rely on the allegations of the petition. The County objected, and the trial court properly sustained the objection. (Code Civ. Proc., § 437c, subd. (p)(2); see *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720, fn. 7 ["It is generally understood . . . that a party cannot rely on the

allegations of his own pleadings, even if verified, to make or supplement the evidentiary showing required in the summary judgment context"].)  On appeal, "we review the record de novo, considering all the evidence set forth in the moving and opposition papers *except that to which objections have been made and sustained.*"  (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 334, italics added.)  In the absence of any admissible evidence that the County Administrator failed to present the fee studies to the Board, we conclude that CPRR failed to raise a triable issue of fact as to the Board's evidentiary basis for setting fees.

We likewise conclude that CPRR failed to raise a triable issue as to whether the Board abused its discretion by using the methodology set forth in the GFR study to calculate copy fees.  As noted, the County supported its motion for summary judgment with a declaration from Olander.  Olander's declaration opines that "the 'productive rate' or 'billing rate' methodology . . . [is] a sound and appropriate accounting methodology commonly used in accounting practice to allocate a pro rata share of direct and indirect costs to a specific product or service."  CPRR did not offer any expert evidence to refute Olander's declaration.  Instead, CPRR argued in conclusory fashion that Lawerys developed the "productive rate" or "billing rate" methodology in order to give public entities a way to increase their fees, thereby increasing demand for Lawerys' consulting services.  These speculative arguments do not create a triable issue as to whether the Board abused its discretion by relying on the methodology set forth in the GFR study to calculate copy fees.  (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981 ["A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact"].)  We therefore conclude that the trial court properly granted the County's motion for summary adjudication of CPRR's second cause of action.

36

d.      *Third Cause of Action (Petition for Writ of Mandate for Violation of Mandatory Duty re Special Tax)*

CPRR's third cause of action alleges that (1) the Recorder's copy fees constitute a "special tax" within the meaning of Proposition 26, and (2) the County violated a "mandatory duty to enact special taxes only by vote of the electorate" in setting copy fees pursuant to the MFR. We conclude that, in the circumstances of this case, Proposition 26 does not impose a ministerial duty for which mandamus will lie.[17]

As previously discussed, an essential element of a cause of action for mandamus is the existence of a clear, present and usually ministerial duty upon the part of the respondent. (Code Civ. Proc., § 1085; *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539-540.) CPRR finds support for the existence of such a duty in Proposition 26, which provides in pertinent part: "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by majority vote." (Cal. Const., art. XIIIC, § 2, subd. (b).) We are not persuaded.

While Proposition 26 is "mandatory" in the sense that local governments must comply with it (see *State Board of Education v. Levit* (1959) 52 Cal. 2d 441, 460 [article I, section 26 "not only commands that [the Constitution's] provisions shall be obeyed, but that disobedience of them is prohibited"]), it does not establish a ministerial duty under the present circumstances. (*Cf. Clausing v. San Francisco Unified School Dist.* (1990)

---

[17] Ordinarily, our conclusion that CPRR has no viable claim for mandamus would obviate the need for us to consider CPRR's claim that the Recorder's copy fees constitute a special tax within the meaning of Proposition 26. (*Erika K. v. Brett D.* (2008) 161 Cal.App.4th 1259, 1272 ["[p]rudent judicial restraint requires courts to avoid the unnecessary decision of constitutional issues"].) In this case, however, CPRR's fourth cause of action for declaratory relief incorporates CPRR's special tax allegations by reference. We therefore consider CPRR's constitutional challenge in the context of the fourth cause of action.

37

221 Cal.App.3d 1224, 1238 ["Although citizens have a private cause of action against public entities for violation of the right to privacy, no case has ever held that California Constitution, article I, section 1, imposes a *mandatory duty* on public entities to protect a citizen's right to privacy. The constitutional mandate is simply that the government is *prohibited* from *violating* the right; if it does, an aggrieved citizen may seek an injunctive remedy in court"]; see also *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 510 [statute permitting campus personnel to direct nonstudents to leave campus if they are or appear likely to interfere with peaceful conduct of activities on campus, but prohibiting impingement upon rights of free speech and assembly, did not create a mandatory duty; "it merely prohibits certain conduct and does not set forth guidelines or rules for schools to follow in implementing an affirmative duty"].)

By its terms, Proposition 26 prohibits, subject to certain exceptions, local governments from imposing new taxes without subjecting them to a majority vote. (Cal. Const., art. XIIIC, § 2, subd. (b).) Proposition 26 does not prescribe specific guidelines for setting or imposing new taxes. We therefore conclude that, in the circumstances of this case, Proposition 26 does not impose a ministerial duty for which mandamus will lie. (*People v. Picklesimer* (2010) 48 Cal.4th 330, 340 ["A ministerial duty is an obligation to perform a specific act in a manner prescribed by law whenever a given state of facts exists, without regard to any personal judgment as to the propriety of the act"]; see also *The H.N. and Frances C. Berger Foundation v. Perez* (2013) 218 Cal.App.4th 37, 48 [" 'In order to construe a statute as imposing a mandatory duty, the mandatory nature of the duty must be phrased in explicit and forceful language' "].) Accordingly, we further conclude that summary adjudication of CPRR's third cause of action was properly granted.

### e. Fourth Cause of Action (Declaratory Relief)

CPRR's fourth cause of action seeks a declaration of the parties' rights under section 27366. We have already extensively addressed the proper interpretation of section 27366, and need not repeat our analysis here. However, CPRR's fourth cause of action also incorporates by reference CPRR's constitutional challenge to the Recorder's copy fees, an argument which, at first blush, we have yet to consider. We turn to this issue momentarily, pausing first to review applicable declaratory relief principles.

### 1.    *Declaratory Relief Principles*

Code of Civil Procedure section 1060, which governs actions for declaratory relief, provides: "Any person interested under a written instrument . . . , or under a contract, or who desires a declaration of his or her rights or duties with respect to another . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract."

"Declaratory relief operates prospectively, serving to set controversies at rest before obligations are repudiated, rights are invaded or wrongs are committed. Thus the remedy is to be used to advance preventive justice, to declare rather than execute rights. [Citation.]" (*Kirkwood v. California State Auto. Assn. Inter-Insurance Bureau* (2011) 193 Cal.App.4th 49, 59.) "The correct interpretation of a statute is a particularly suitable subject for a judicial declaration. [Citation.] Resort to declaratory relief is therefore is appropriate to attain judicial clarification of the parties' rights and obligations under the applicable law. [Citation.]" (*Ibid.*) Declaratory relief is also a proper remedy to determine the constitutionality of a statute. (*Lane v. City of Redondo Beach* (1975) 49 Cal.App.3d 251, 255.)

Summary judgment is appropriate in a declaratory relief action when only legal issues are presented for the court's determination. (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1401-1402.) The defendant's burden in a declaratory relief

action "is to establish the plaintiff is not entitled to a declaration in its favor. It may do this by establishing (1) the sought-after declaration is legally incorrect; (2) undisputed facts do not support the premise for the sought-after declaration; or (3) the issue is otherwise not one that is appropriate for declaratory relief." (*Id.* at p. 1402.)

### 2. *Constitutional Challenge*

CPRR contends the Recorder's copy fees constitute a "special tax" within the meaning of Proposition 26 and section 50076. The petition and complaint generally allege that the copy fees constitute a special tax because they exceed the reasonable cost to the Recorder's Office of making copies. On summary judgment, the County argued the copy fees are reasonable because they recover the "direct and indirect costs" of making copies within the meaning of section 27366. CPRR responded that the copy fees were "per se unreasonable" because they purportedly violate sections 27360 and 27366. (Italics omitted.) The trial court found that CPRR "fails to establish that the copy fees exceeded the reasonable costs to [the Recorder] of providing the copies."

On appeal, CPRR again argues that the County's alleged violation of section 27366 establishes a violation of Proposition 26. According to CPRR, "because [the County] violated the cost-recoupment standards of the statutes and the common law (narrowly construed) there is an ipso facto violation of the reasonableness standard just as violation of a statute constitutes an ipso facto violation of the reasonableness standard in negligence cases (negligence per se)." (Italics omitted.) We reject this premise and conclude that CPRR has failed to demonstrate error.

California voters adopted Proposition 13 in 1978 (Cal. Const., art. XIIIA, added by Prop. 13, as approved by voters, Primary Elec. June 6, 1978) to require—among other constitutionally implemented tax relief measures—that any "special taxes" for cities, counties, and special districts be approved by two-thirds of voters. (Cal. Const., art. XIIIA, § 4.) In 1996, voters adopted Proposition 218 (Cal. Const., art. XIIID, added by Prop. 218, as approved by voters, Gen. Elec., Nov. 5, 1996), with one of its aims being

"to tighten the two-thirds voter approval requirement for 'special taxes' and assessments imposed by Proposition 13." (*Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County* (2013) 218 Cal.App.4th 195, 197 (*Brooktrails*).) To this end, Proposition 218, section 3 added article XIIIC to require that new taxes imposed by a local government be subject to vote by the electorate. (Cal. Const., arts. XIIIA, §4 and XIIIC, § 1, as approved by voters, Gen. Elec., Nov. 5, 1996; see also 2B West's Ann. Cal. Codes (2013 ed.) pp. 362-363.) General taxes may be approved by a simple majority of voters but special taxes require two-thirds voter approval. (Cal. Const. Art. XIIIC, § 2, subds. (c) & (d).)

Proposition 26, section 3 added subdivision (e), to section 1, of article XIIIC, broadly defining "tax" to include "any levy, charge, or exaction of any kind imposed by a local government." (Cal. Const., art. XIIIC, § 1, subd. (e).) Subdivision (e) incorporates seven exceptions to this definition of tax. (*Ibid.*) As pertinent here, article XIIIC, section 1, subdivision (e)(2) provides that the definition of "tax" does not include "[a] charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." Proposition 26 further provides that "[t]he local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Cal. Const., art. XIIIC, § 1 [last para.].)

Proposition 26 does not apply to local taxes that existed prior to its November 3, 2010, effective date. (*Brooktrails, supra,* 218 Cal.App.4th at p. 205-207.) The MFR was adopted on May 19, 2009, almost eighteen months prior to the adoption of Proposition 26. Because the MFR predates Proposition 26, the County contends the copy fees were

41

grandfathered in, and cannot be characterized as "special taxes." CPRR counters that the Board adopts a master fee resolution every year as part of the County's budget process.

We cannot discern, on the record before us, whether the copy fees were established by means of a single legislative act (the MFR) which predates the adoption of Proposition 26, such that they are grandfathered in, or whether they were annually reenacted by master fee resolution following the adoption of Proposition 26, such that they are not. (Cf. *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 702-704 [discussing the "reenactment rule" in a different statutory context]; *Arcadia Development Co. v. City of Morgan Hill* (2008) 169 Cal.App.4th 253, 262-266; see also *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 825 ["Cities and counties must eventually obey the state laws governing their taxing authority and cannot continue indefinitely to collect unauthorized taxes"].) Giving CPRR the benefit of the doubt, we assume that the copy fees were not grandfathered in. (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1098 [opposing party's evidence is liberally construed on summary judgment].)

Assuming for the sake of argument that Proposition 26 applies, we next consider whether the trial court erred in summarily adjudicating CPRR's constitutional challenge. We conclude that CPRR has failed to demonstrate error.

On appeal, CPRR contends the Recorder's copy fees violate Proposition 26 because they fail to comply with section 27366. Significantly, CPRR does not contend the County cannot constitutionally recover indirect costs, as we have interpreted that term. It is therefore unnecessary for us to parse the differences, if any, between "reasonable costs," as used in Proposition 26 and "direct and indirect costs," as used in section 27366. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 ["Though summary judgment review is de novo, review is limited to issues adequately raised and supported in the appellant's brief"]; see also *Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 564 ["[I]t is not a reviewing court's role to

construct theories or arguments which would undermine the judgment"].)  We express no opinion on this issue.  Instead, we tailor our analysis to the narrow constitutional question raised by CPRR's appeal; namely, whether the Recorder's copy fees are per se unreasonable under Proposition 26 because they recover costs CPRR believes to be nonrecoupable under section 27366 and California common law.  We observe that CPRR's constitutional challenge, as framed by CPRR, is simply a variation on the theme that section 27366 and California common law preclude the County from recovering indirect costs that cannot be specifically associated with the production of copies.

We have already considered and rejected CPRR's contention that the Recorder's copy fees run afoul of section 27366 and California common law.  Having done so, we likewise reject CPRR's contention that the claimed violation of section 27366 and California common law establishes, ipso facto, a violation of Proposition 26.  We therefore conclude, for the reasons previously discussed, that CPRR failed to rebut the County's showing that the Recorder's copy fees comply with section 27366.  (*Gafcon, Inc. v. Ponsor & Associates, supra,* 98 Cal.App.4th at p. 1402.)  The trial court properly granted the County's motion for summary adjudication of CPRR's fourth cause of action.

### f.       Fifth Cause of Action (Negligence)

CPRR's fifth cause of action asserts claims for breach of mandatory duty (§ 815.6) and negligence based on the County's alleged breach of a "duty to refrain from demanding and collecting user fees for copies of recorded documents from [CPRR] and the public that exceeded the direct and indirect costs that were actually incurred in making copies and which would not have been incurred but for the copy-making activity."  The trial court properly granted the County's motion for summary adjudication of CPRR's negligence cause of action.

Preliminarily, we reject CPRR's contention that Judge White improperly reconsidered and reversed Judge Maguire's previous order overruling the County's demurrer to the fifth cause of action.  The County demurred to the fifth cause of action

43

pursuant to section 815, subdivision (a). (See § 815, subd. (a) ["A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person"].) The trial court (Maguire, J.) overruled the demurrer, stating "[the County] does not demonstrate that . . . section 27366 may not properly provide a basis for liability under . . . section 815.6." Later, the County moved for summary adjudication of the fifth and sixth causes of action on the grounds that "[the County is] immune from liability and the negligence claim is barred by the economic loss rule." Judge White granted the motion on the grounds that the County had established that immunity with respect to these causes of action.

Contrary to CPRR's contention, Code of Civil Procedure section 1008 did not deprive Judge White of jurisdiction to consider the County's immunity defense on summary judgment. As the Court of Appeal for the Second Appellate District, Division 6 explained in *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199: "[A] motion for summary judgment or adjudication is not a reconsideration of a motion overruling a demurrer. They are two different motions. To hold that a trial court is prevented in a motion for summary judgment or adjudication from revisiting issues of law raised on demurrer is to condemn the parties to trial even where the trial court's decision on demurrer was patently wrong. The result would be a waste of judicial resources, the very evil Code of Civil Procedure section 1008 was intended to avoid. Nothing in the language of [Code of Civil Procedure] section 1008 compels its application to the instant motion for summary adjudication. In fact, to apply it here would run contrary to its purpose." (*Id.* at p. 205.) Following *Community Memorial Hospital*, we likewise conclude that nothing in the language of Code of Civil Procedure section 1008 prevented Judge White from considering the County's immunity defense on summary judgment.

Having rejected CPRR's procedural objection, we next consider whether the undisputed facts establish a defense to liability. We conclude they do.

Under the Act, public entities are not liable for injuries arising out of their acts or omissions, except as provided by statute. (§ 815, subd. (a); see *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932.) In this case, CPRR relies upon the liability created by section 815.6, which provides: "Where a public entity is under a *mandatory duty* imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Italics added.)

Under section 815.6, "the government may be liable when (1) a mandatory duty is imposed by enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348.) Our Supreme Court has recently explained that, in considering a claim for liability under section 815.6, "the first question is whether the plaintiff has alleged the breach of a mandatory duty. [Citation.] If there is no actionable duty, the question of immunity does not arise. [Citations.]" (*Ibid.*) Thus, CPRR's fifth cause of action requires us to revisit the question whether section 27366 establishes a mandatory duty under section 815.6. We have already concluded that section 27366 does not establish a ministerial duty for purposes of mandamus. We likewise conclude that section 27366 does not establish a mandatory duty for purposes of section 815.6.

g.      *Sixth Cause of Action (Money Had and Received)*

CPRR's sixth cause of action, for money had and received, alleges that CPRR and the putative class "have paid to [the County], at [the County's] special instance and request, in excess of $25,000 in illegal overcharges, have been damaged thereby, and are entitled to recoupment of the overcharges according to proof." The trial court granted the County's motion for summary adjudication of the sixth cause of action on immunity

45

grounds. On appeal, CPRR contends the trial court erred because section 814 provides for liability based upon contract.[18] CPRR fails to demonstrate error.

As the County observes, nothing in the record suggests the existence of a contractual relationship between CPRR and the County. CPRR does not explain why section 814 might be relevant or otherwise elaborate on the claim of error. In the absence of any reasoned analysis or argument, we treat the claim as waived. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "].)

B.    *Attorneys' Fees*

Finally, CPRR contends the trial court abused its discretion in denying its request for more than $450,000 in attorneys' fees. According to CPRR, "Only one inexperienced in the realities of litigation, or naïve, can believe that the suit did not motivate the fee reduction." We disagree, and perceive no abuse of discretion in the denial of attorneys' fees.

1.    *Standard of Review*

"Generally, whether a party has met the statutory requirements for an award of attorney fees is best decided by the trial court, whose decision we review for abuse of discretion. [Citation.]" (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 519, fn. omitted (*Coalition*).) "To determine whether the trial court abused its discretion, we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fees and whether it

---

[18] CPRR also contends Judge White improperly reconsidered and reversed Judge Maguire's previous order overruling the County's demurrer to the sixth cause of action. We have already considered and rejected this argument.

46

applied the proper standards of law in reaching its decision. [Citation.]" (*Id.* at pp. 519-520.)

2. *Catalyst Theory*

Code of Civil Procedure section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Code of Civil Procedure section 1021.5 "acts as an incentive for the pursuit of public interest-related litigation that might otherwise have been too costly to bring." (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 611-612.) "However, a party seeking an award of Code of Civil Procedure section 1021.5 attorney fees must first be determined to be 'a successful party.' [Citation.]" (*Coalition, supra,* 238 Cal.App.4th at p. 521.) "It is not necessary for a plaintiff to achieve a favorable final judgment to qualify for attorney fees so long as the plaintiff's actions were the catalyst for the defendant's actions, but there must be some relief to which the plaintiff's actions are causally connected." (*Ibid.*)

"The 'catalyst theory' permits an award of attorney fees even when the litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation. [Citation.] To obtain attorney fees under this theory, a plaintiff must establish that (1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) the lawsuit had merit and achieved its catalytic effect by threat of victory, not be dint of nuisance and threat of expense; and (3) the plaintiffs reasonably attempted to settle the litigation prior to filing

47

the lawsuit." (*Coalition, supra,* 238 Cal.App.4th at p. 521.) We need not consider all of these factors because we conclude that CPRR failed to achieve its primary objective, which was to change the way in which the County calculates copy fees.

On appeal, CPRR implies that the primary relief sought by the litigation was a general reduction in copy fees. But the petition and complaint confirm that CPRR's primary goal was to change the way in which the County calculates copy fees by limiting recoverable indirect costs. To this end, the petition alleges that the County "violated [its] duty to limit the amount of fees charged for copies of recorded documents to recoupment of direct and indirect costs actually incurred in producing copies and which would be avoided if copies were not produced for the public upon request." Similarly, the complaint alleges, the County "had the duty to refrain from demanding and collecting user fees for copies of recorded documents from [CPRR] and the public that exceeded the direct and indirect costs that were actually incurred in making copies and which would not have been incurred but for the copy-making activity." CPRR's prayer for relief seeks a writ of mandate compelling the County to "[c]ollect fees for paper copies of recorded documents that do not exceed 10 cents per page or according to proof," and a declaration that the Recorder's copy fees "exceed[] the legal limit." Thus, CPRR's petition and complaint do not merely seek a reduction in fees; they seek a change in the way the County calculates fees.

CPRR did not achieve its objective. The County continues to calculate copy fees using the methodology described in GFR study. Although the Recorder's Office now charges $7.50/$2.00 for copies, the reduced rate is the result of a change in staff salaries, not a change in the way the County calculates fees. Despite the reduction in fees, CPRR failed to obtain the primary relief sought. (See *Marine Forests Society v. California Coastal Commission* (2008) 160 Cal.App.4th 867, 878 ["In cases where judicial relief was obtained, it is sufficient if the plaintiff achieved partial success or succeeded on *any* significant issue in the litigation which achieved *some* of the benefit the plaintiff sought

48

in bringing suit. [Citation.] However, in catalyst cases, the defendant must have provided the plaintiff with the *primary* relief sought"].) Thus, CPRR failed to establish that the County "change[d] its behavior substantially because of, *and in the manner sought by,* the litigation." (*Coalition, supra,* 238 Cal.App.4th at p. 523.) We conclude that CPRR failed to establish the criteria necessary for an award of attorneys' fees under Code of Civil Procedure section 1021.5 on a catalyst theory. The trial court does not have discretion to award attorneys' fees unless the statutory criteria have been met as a matter of law. (*McGuigan v. City of San Diego* (2010) 183 Cal.App.4th 610, 623.) We therefore conclude that the trial court did not abuse its discretion when it denied CPRR's motion for attorneys' fees.

### III. DISPOSITION

The judgment and order denying attorneys' fees are affirmed. Respondents County of Yolo and Freddie Oakley shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

RENNER, J.

We concur:

/S/

RAYE, P. J.

/S/

NICHOLSON, J.