Filed 6/26/13; pub. order & mod. 7/24/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BROOKTRAILS TOWNSHIP COMMUNITY SERVICES DISTRICT, <br>     Plaintiff and Respondent, <br><br> v. <br><br> BOARD OF SUPERVISORS OF MENDOCINO COUNTY et al., <br><br>     Defendants. | A135900 <br><br> (Mendocino County Super. Ct. No. SCUK CVG-1057508) |
| DAVID PALAND, <br><br>     Intervener and Appellant. | |

Proposition 218, adopted by the voters in 1996, added articles XIII C and XIII D to the California Constitution.[1]  One of its most prominent features was to tighten the two-thirds voter approval requirement for "special" taxes and assessments imposed by Proposition 13.  (Art. XIIIA, § 4 Art. XIII C, § 2, subd. (d); art. XIII D, §§ 3, 4, subd. (g), 6, subd. (c).)[2]  In *Paland v. Brooktrails Township Community Services Dist. Bd. of*

---

[1] References to articles are to the California Constitution.

[2] Proposition 218 was entitled the "Right to Vote on Taxes Act" and had this preamble:  "The people of the State of California hereby find and declare that Proposition 3 was intended to provide effective tax relief and to require voter approval of tax increases.  However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval

*Directors* (2009) 179 Cal.App.4th 1358 (*Paland I*), Division Five of this District concluded that "a minimum charge imposed on parcels with connections to a water district's utility systems for the basic cost of providing water or sewer service, regardless of actual use, is a charge for an immediately available property-related water or sewer service as defined in article XIII D, section 6, subdivision (b)(4), and consequently does not require ballot approval by affected owners." (*Id*. at p. 1362.)

This appeal involves the response of the losing party in *Paland I*: David Paland, a resident of the Brooktrails Township Community Services District (District). Having been told that he could be required to pay for sewer and water connections even if they were inactive because he had discontinued service, Paland resolved on a novel rejoinder. He drafted an initiative that would in effect have ended the practice he had unsuccessfully battled in *Paland I*. The initiative passed, but only by a simple majority. However, at the same election voters statewide enacted Proposition 26 with the ostensible purpose of further tightening Proposition 218's restrictions on revenue-generating measures that are not approved by voters. (See fn. 5, *post*.)

On petition of the District, the trial court overturned the approval of the local initiative in the belief that a two-thirds majority was required, which was in turn premised on the applicability of the just-enacted Proposition 26. We conclude that indulging that premise was error, because there is nothing in Proposition 26 indicating that it was meant to have a retroactive application. With Proposition 26 removed from consideration, the water and sewerage operations of the District remains as discussed in *Paland I*—not subject to Proposition 218's supermajority requirement. Consequently, a simple majority is all that was necessary for the local initiative to pass and take effect. In light of this conclusion, we reverse.

---

for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local government exacts revenue from taxpayers without their consent."
(Prop. 218, §§ 1-2, Stats. 1996, pp. A-295-297; also reprinted at Historical Notes, 2B West's Ann. Cal. Codes (2013) foll. Art. 13C, § 1, p. 363.)

## BACKGROUND

Much of the relevant history behind this dispute was set out in *Paland I*:

"The Brooktrails Township Community Services District (District) was formed to provide water and sewer service to about 6,500 real property parcels in or near Willits, California.[3] [Citation.] About 1,536 of the parcels are currently connected to the District's water system, and about 1,490 are connected to its sewer system. The rest of the parcels are undeveloped and not yet connected to the District's utility systems. Parcels not connected to the water and sewer systems are charged annual water availability and sewer standby fees. Parcels connected to the water and sewer systems are charged connection fees at the time of hookup to the systems, and thereafter fixed monthly water and sewer 'base rates,' as well as inclining usage-based rates for water service. The sewer connection is not a metered service, and is therefore not subject to a usage charge beyond the monthly base rate.

"Appellant David Paland, a property owner in the District, connected his parcel to the water and sewer systems in 1986 and paid $1,800 in connection fees. In the decades that followed, he periodically discontinued his water service when he was away from his home for extended periods of time or when he asserts he could not afford the service. On such occasions, he was historically charged a prorated amount of the water and sewer base rates for the month in which his service was discontinued and was not charged again until he requested reactivation of his water service. Until 2003, it was District policy not to charge base rates to parcels with existing connections that were inactive because the parcels were either undeveloped or unoccupied, or because the owners had temporarily discontinued their service.

"The District changed its policy in 2003. At the time, the state Department of Health Services had imposed a moratorium on new connections pending an increase in

---

[3] A community services district is authorized to exercise a wide variety of powers, including the supply of water; the treatment of liquid and solid waste; the construction and maintenance of roads and streets; and the provision of fire, police and emergency services. (Gov. Code, § 61100.)

the District's water storage capacity. The Department of Health Services mandates increased the District's capital investment costs and eliminated its income from new connections. On March 11, 2003, the District's Board of Directors (Board) decided to begin charging established monthly base rates to parcels with existing utility connections, regardless of whether the owner was actually using the District's services. On April 24, 2003, District General Manager Michael Chapman wrote to Paland and 20 other property owners with currently or periodically inactive water meters informing them of the change of policy.

"Paland protested the new policy. He questioned [the] Board's statutory authority to impose monthly base rates on inactive connections, arguing that the practice was 'in the nature of a standby fee' and that the Board had not complied with Proposition 218 or due process. Although the Board did not rescind its policy, Paland took no immediate legal action because he 'did not become aware that the thing had actually gone through as any kind of ordinance . . . .' He did not discontinue his water service between 2003 and 2006.

"In late 2006, Paland fell behind on his monthly bills. In October 2006, the District notified him that his service would be shut off if he did not pay the arrears. In a letter to the district general manager dated December 25, 2006, Paland wrote that his water had been turned off, that he would pay the arrears as soon as he could, that he could not afford to pay ongoing base rates because he was unemployed, and, 'For that reason, I have no plans to ask you to turn the water back on until I can afford the huge base rate.' By the end of January 2007, Paland apparently had paid his arrears through November 2006. Paland's subsequent monthly bills reflect no actual water usage. The District, however, continued to charge Paland the monthly base rates for both water and sewer services.

"On May 17, 2007, Paland sued the Board for declaratory and injunctive relief. He alleged that in 2007, pursuant to the 2003 policy, the District began charging him monthly base rates . . . for time periods when he had requested that his water service be turned off. He again argued the monthly base rates, when charged to customers whose

4

water service had been turned off, were 'standby charges' subject to the owner voting requirements of article XIII D, section 4, and that the District had failed to comply with those requirements." (*Paland I*, *supra*, 179 Cal.App.4th 1358, 1362-1363, fns. omitted.) Paland lost and appealed.

Division Five agreed with the trial court that Proposition 218 did not entitle Paland to relief. The court opened its analysis by defining the nature and scope of the problem:

"The core issue in this appeal is whether the imposition of minimum monthly water and sewer base rates on parcels connected to the District utility systems, regardless of actual usage, is a property assessment subject to owner ballot approval requirements adopted in Proposition 218 (art. XIII D, § 4), or is instead a fee or charge for a property-related service exempted from those requirements (art. XIII D, § 6, subd. (c))." (*Paland I*, *supra*, 179 Cal.App.4th 1358, 1364-1365.) "The narrow focus of this dispute is the proper interpretation and application of article XIII D, section 6, subdivision (b)(4), which distinguishes between fees and assessments: 'A fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements: [¶] . . . [¶] (4) No fee or charge may be imposed for a service unless that is actually used by, or *immediately available to*, the owner of the property in question. Fees or charges based on potential or future use of a service are not permitted. *Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4.*' (Art. XIII D, § 6, subd. (b)(4), italics added.)" (*Paland I*, *supra*. at pp. 1366-1337.)

"Paland argues that, despite the existence of a metered connection for water service at his parcel, that service is still not immediately available to him, and to those similarly situated with inactive connections, and therefore the imposition of minimum base rates on such parcels is a standby charge that must be classified as an assessment under article XIII D, section 6, subdivision (b)(4). He asserts that water service is not immediately available to him when his connection is inactive because the District would have to unlock his water meter before he could use the service. Also, he argues the service is not immediately available because the District will not unlock his meter unless

he pays his past-due bills. In his view, the service is not immediately available unless he can 'twist his tap and turn on the water.' If, as Paland contends, the minimum monthly base rate charged by the District is indeed a standby charge, it would unquestionably be subject to article XIII D, section 4 assessment approval procedures." (*Paland I*, *supra*, 179 Cal.App.4th 1358, 1367.)

After a discussion of the relevant decisional law, the court stated: "The terms 'immediately available' and 'potential or future use of a service' as used in the initiative are relative and inherently imprecise. Construed narrowly, service is 'immediately available" only if, as Paland suggests, water flows out of a faucet when the property owner turns on the tap. However, voters might reasonably have intended "immediately available" to include circumstances where the District has provided utility connections directly to the owner's parcel and the service is 'immediately available' subject only to the volitional decision of the property owner to request service." (*Paland I*, *supra*, 179 Cal.App.4th 1358, 1369.)

"We conclude the 'immediately available' requirement is logically focused on the agency's conduct, not the property owner's. As long as the agency has provided the necessary service connections at the charged parcel and it is only the unilateral act of the property owner (either in requesting termination of service or failing to pay for service) that causes the service not to be actually used, the service is 'immediately available and a charge for the service is a fee rather than an assessment (assuming the other substantive requirements of a fee are satisfied).

"Here Paland long ago paid the connection charges and became a customer of the District, with water and sewer services provided through pipes physically connected to the property. He cannot contend that the services are not available to him, because quite evidently they have been available at all times he has chosen to use them. The District can and will immediately turn on water service to Paland's property once Paland requests that the service be renewed and satisfies any delinquency. Any lack of immediacy in this process is due solely to circumstances within his control.

6

"A contrary conclusion would lead to an anomalous result whereby an individual property owner could unilaterally preclude collection of his or her pro rata obligation for the maintenance and operation of a utility system absent an owner vote, while the owner of an adjacent parcel with an active connection would have no such option. Further, such an argument, which would divorce the base rates imposed on parcels with *inactive* connections from the base rates imposed on parcels with active connections would take the former rates outside of Proposition 218 altogether, thus undermining rather than assisting Paland's case. In *Richmond,* in deciding that a water connection charge was not subject to Proposition 218 requirements, the Supreme Court held that in order for a charge to be either an assessment or fee within the meaning of Proposition 218, it must apply to parcels that can be identified in advance. (*Richmond* [*v. Shasta Community Services Dist* (2004) 32 Cal.4th 409,] 418–419, 427–428; see also *Bighorn*[-*Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205,] 208–209 [recognizing conclusion in *Richmond* that 'connection charges were not "assessments" or "property-related fees or charges" within the meaning of article XIII D'].) Both section 4 and section 6 of article XIII D require agencies to identify affected parcels in advance of imposing an assessment or a fee for purposes of providing notice and conducting the required voter approval procedures. [Citation.] Because the decision to discontinue water service is a voluntary act by the property owner that cannot be anticipated by the District, parcels affected by a fee that specifically applied to parcels with *inactive connections* could not be fully identified in advance and the fee would not be covered by Proposition 218 at all." (*Paland I*, *supra*, at pp. 1370-1371.)

Thereafter, Paland drafted and sponsored Measure D, "An Initiative To Prevent the Brooktrails Township Community Services District from Imposing Mandatory Water and Sewer Base Rates after Service has been Discontinued." The pertinent language provided: "The Brooktrails Township Community Services District shall not collect base rate service charges, or any other service charges, for water or sewer service, for more than two days after the customer has requested discontinuance of service. The District shall not require that a parcel owner relinquish a water or sewer connection as a condition

7

of discontinuing service. The District shall not impose a fee for more than the reasonable cost of turning the service back on when the property owner requests resumption of service. Merely having pipes connected to the District's water or sewer system is not a service that may be charged for."[4]

The Mendocino County Counsel's "Impartial Analysis" advised voters that "This measure requires voter approval by a simple majority vote of the qualified voters." At the November 2, 2010 election, Measure D passed by a simple majority of 737 to 637. At the same time, the voters of the state adopted Proposition 26, which, as relevant here,

---

[4] Paland also wrote the argument in favor of Measure included in the voters' pamphlet:

"Everyone should have the right to decide which services they want to receive. Nobody would expect to pay for telephone services, cable TV service, electric service, DMV fees, or any other service they did not use. The District initiated a policy that took away every parcel owner's right to turn off their water to obtain service fees from 21 lot owners who had their water turned off. The District's policy leads to a situation where the District turns off water for non-payment while continuing to charge the property owner at the full base rate. This charge eventually becomes a lien on the property if not paid.

"In 1996, voters passed Proposition 218, which states in part:

" 'No fee or charge may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question. Fees or charges based on potential or future use of a service are not permitted. Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed with compliance with Section 4.'

"Compliance with 'Section 4' meant that standby charges would have to be approved by voters, in addition to meeting other requirements before assessments could be imposed. However, in interpreting Proposition 218, the courts held that charges for water and sewer service when water is locked off by the District are not really standby charges, but fees for a service that is actually being received. It is hard to imagine that property owners are receiving service even when their water is locked-off by the District. Please vote yes on this initiative and reclaim the right to control the charges on your property."

8

expanded the definition of what constituted a "tax" for purposes of article XIII C.[5] One of the declared purposes of Proposition 26 was to halt evasions of Proposition 218.[6]

----

[5] Specifically, Proposition 26 added a new definition to article XIII C, section 1:

"(e) As used in this article, 'tax' means any levy, charge, or exaction of any kind imposed by a local government, except the following:

"(1) A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege.

"(2) A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product.

"(3) A charge imposed for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof.

"(4) A charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property.

"(5) A fine, penalty, or other monetary charge imposed by the judicial branch of government or a local government, as a result of a violation of law.

"(6) A charge imposed as a condition of property development.

"(7) Assessments and property-related fees imposed in accordance with the provisions of Article XIII D.

"The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity."

The other major part of Proposition 26 was a comparable amendment to article XIII A governing ad valorem taxation.

[6] The Findings and Declarations of Purpose for Proposition 26 state, as relevant here: "Since the enactment of Proposition 218 in 1996, the Constitution of the State of California has required that increases in local taxes be approved by the voters. [¶] Despite these limitations, California taxes have continued to escalate. Rates for . . . a myriad of state and local business taxes are at all-time highs. Californians are taxed at one of the highest levels of any state in the nation. [¶] . . . [¶] This escalation in taxation

9

The District promptly brought suit against the Board of Supervisors and the County Clerk of Mendocino County for declaratory relief that Measure D "is not in effect," was "facially unconstitutional," and should not be enforced "for want of having achieved a two-thirds vote" as required by Proposition 26.

Paland was allowed to intervene as a defendant, but not to file a cross-complaint against the District.  Thereafter, the Board of Supervisors and Clerk advised the court that they "will not be offering a defense to this action" and were "not taking a position on the issue."  Following a two-day bench trial, the trial court accepted the District's argument that the effect of Measure D allowing property owners with existing connections to "go inactive" would raise the base rates for property owners who remained connected, which would in practical effect amount to a raise in what property owners who remained connected paid for the connection.  The trial court reasoned that this increase amounted to a "tax" according to the new definition of that term adopted in Proposition 26.[7]  (See fn. 5, *ante*.)

Paland perfected this timely appeal from the judgment entered in due course.

## DISCUSSION

Paland attacks the judgment from a number of angles ranging from the erroneous exclusion of evidence to the erroneous interpretation of state and federal Constitutions.  And while the trial court heard testimony and appears to have made a number of factual determinations (some of which Paland attacks as lacking the support of substantial evidence), the governing issue addressed in the trial court's statement of decision was

does not account for the recent phenomenon whereby . . . local governments have disguised new taxes as 'fees' in order to extract even more revenue from California taxpayers without having to abide by these constitutional voting requirements . . . .  [¶] In order to ensure the effectiveness of these constitutional limitations, this measure . . . defines a 'tax' for state and local governments so that neither the Legislature nor local governments can circumvent these restrictions on increasing taxes by simply defining new or expanded taxes as 'fees.' "  (Prop. 26, § 1, subds. (b), (c), (e), (f), reprinted at Historical Notes, 2B West's Ann. Cal. Codes (2013) foll. Art. 13A, § 3, p.297.)

[7] The trial court also addressed certain issues—such as whether Measure D violated the single subject rule—that are not raised on this appeal.

10

whether the consequence of passing Measure D was the imposition of a tax. That is an issue of law we consider de novo. (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 873-874.) However, our resolution of this appeal is most expeditiously achieved by examining the premise of the trial court's decision, specifically, that Proposition 26 applied to this controversy. This too presents an issue of law. (*Covert v. State Bd. of Equalization* (1946) 29 Cal.2d 125, 133 ["construction and application of the Constitution . . . is a question of law"]; *Chen v. Franchise Tax Bd*. (1998) 75 Cal.App.4th 1110, 1114 [same].)

As a statewide initiative, Proposition 26 took effect the day after it was approved by the voters. (Arts. II, § 10, subd. (a), XVIII, § 4.) In seeking to use Proposition 26 to overturn the election result that occurred the day before it became effective, the District is plainly trying to give Proposition 26 a retroactive application. Just as with newly enacted statutes, constitutional amendments are presumed to have a purely prospective application. (*Strauss v. Horton* (2009) 46 Cal.4th 364, 470.) This is only a presumption, and can therefore be overcome, but doing so is no easy task. There must be either an express retroactivity provision in the actual language of the amendment, or extrinsic sources leave no doubt that such was the voters' manifest intent. (*Ibid*.) Here, there is neither.

Proposition 26 did have something akin to a retroactivity provision, but one of no help to the District. As previously shown, Proposition 26 had two components, the first amending the definition of "tax" in article XIII A and the second doing the same for article XIII C. (See fn. 5, *ante*.) The former has this language: "Any tax adopted after January 1, 2010, but prior to the effective date of this act, that was not adopted in compliance with the requirements of this section is void 12 months after the effective date of this act unless the tax is reenacted by the Legislature and signed into law by the Governor in compliance with the requirements of this section." (Art. XIII A, § 3, subd. (c).) There is no such language in the amendment of article XIII C, the governing provision here. In other words, retroactivity was addressed in Proposition 26, but solely for *state* measures affecting ad valorem taxes.

11

This absence is particularly telling given the history of these parts of our constitution.  When article XIII A was adopted in June 1978, the framers of Proposition 13 included the following:  "This article shall take effect for the tax year beginning on July 1 following the passage of this Amendment, except Section 3 [imposing the two-thirds requirement on legislative modifications] which shall become effective upon passage of this article."  (Art. XIII A, § 5.)  Subsequent amendments have continued the practice of precise chronological designations.  (See *id*., § 2, subd. (a) ["This paragraph shall apply to any replacement dwelling that was purchased or newly constructed on or after November 5, 1986," "This paragraph . . . does not apply to any replacement dwelling that was purchased or newly constructed before November 9, 1988"], subd. (e)(2) ["this subdivision applies to any comparable replacement property acquired or newly constructed after July 1, 1985, and to the determination of base year values for the 1985-86 fiscal year and fiscal years thereafter"], subd. (e)(3) ["This paragraph applies to any comparable replacement property that is acquired or newly constructed as a replacement for property substantially damaged or destroyed by a disaster . . . occurring on or after October 20, 1991, and to the determination of base year values for the 1991-92 fiscal year and fiscal years thereafter"].)

When Proposition 218 added article XIII D in November 1996, it included this language:  "Pursuant to subdivision (a) of Section 10 of Article II, the provisions of this article shall become effective the day after the election unless otherwise provided. Beginning July 1, 1997, all existing, new or increased assessments shall comply with this article."  (Art. XIII D, § 5.)  Additionally, "Beginning July 1, 1997, all fees or charges shall comply with this article."  (*Id*., § 6, subd. (d).)  But of far more consequence is that Proposition 218 had the type of language so conspicuously absent from Proposition 26: "Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years

12

of the effective date of this article and in compliance with subdivision (b)." (Art. XIII C, § 2, subd. (c).)

Thus, those who framed the direct antecedents of Proposition 26 knew how to specify when new rules would take effect. They also knew how to provide for the demise of measures that were not reenacted. The framers of Proposition 26 made no provision directing that it would impose new requirements for the validity of existing local government assessments, fees, or charges. "When we interpret an initiative, we . . . consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the . . . initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the [language] or rewrite it to conform to some assumed intent not apparent from that language." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571; accord, *Howard Jarvis Taxpayers Assn. v. City of San Diego* (1999) 72 Cal.App.4th 230, 235.) In the context of Proposition 26, the assumed intent we cannot insert is retroactive application to existing local assessments, fees, or charges.

We have examined the ballot arguments attending Proposition 26, and have found nothing evidencing an intent for retroactive application. The District in its brief points to nothing in the official voter information guide indicative of such an intent.

With Proposition 26 removed from consideration, two factors become dispositive. The first is *Paland I*, which established that the District's water and sewerage operations were not being conducted in violation of Proposition 218. More precisely, Division Five held that the money property owners were required to pay did not qualify as a tax requiring a two-thirds vote, or even as an assessment that required a simple majority vote (and at a hearing that did not necessitate an actual election); the money exacted was a fee, the imposition of which did not even require a vote of any kind. (*Paland I*, *supra*, 179 Cal.App.4th 1358, 1365-1367, 1371-1372; see art. XIII D, §§ 3-4.) Thus, Proposition 218 was not an impediment to Paland seeking to change the District's current fee structure. (Cf. *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 176 [Proposition 218 not applicable to existing municipal tax].)

13

The second factor is Proposition 218's directive that "Notwithstanding any other provisions of this Constitution, . . . the initiative power shall not be prohibited or otherwise limited in matters of reducing or repealing any tax, assessment, fee or charge. The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments . . . ."  (Art. XIII C, § 3; see *Bighorn-Desert View Water Agency v. Verjil*, *supra*, 39 Cal.4th 205, 213 [this language also applicable to art. XIII C fee and charges].)  Using that power is precisely what Paland—and the majority of the District's voters—did in passing Measure D.

The District does not convince us that the predicate of this analysis—that application of Proposition 26 involves the issue of retroactivity—is faulty.  The trial court concluded that while Proposition 26 took effect the day after the election, the application of Elections Code section 9320 made Measure D effective "at a later date."[8]  The District defends this reasoning, insisting that because Proposition 26 was therefore effective before Measure D, there is no true issue of retroactivity.  This court has previously recognized that " 'A . . . retroactive statute is one that operates on matters that occurred, or on rights, obligations, or conditions that existed, before the time of its enactment, giving them an effect different from that which they had under previously law.' " (*Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 613.)  The "rights, obligations, [and] conditions that existed" prior to enactment of Proposition 26 was the legal landscape analyzed in *Paland I* and assumed by the Mendocino County Counsel to be legally accurate.  Proposition 26 would entirely reorder that landscape.  Thus, the retroactivity of Proposition 26 is truly presented.

---

[8] Concerning special district elections, the cited statute provides:  "If a majority of the voters voting on a proposed ordinance in its favor, the ordinance shall become a valid and binding ordinance of the district.  The ordinance shall be considered as adopted upon the date the vote is declared by the district board, and shall go into effect 10 days after that date."  The parties were unable to establish the precise date that Measure D became effective, only that it was "sometime during the month of November 2010."

14

## DISPOSITION

The judgment is reversed.

_____
Richman, J.

We concur:

_____
Haerle, Acting P.J.

_____
Lambden, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BROOKTRAILS TOWNSHIP COMMUNITY SERVICES DISTRICT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF SUPERVISORS OF MENDOCINO COUNTY et al.,<br><br>    Defendants.<br><br>DAVID PALAND,<br><br>    Intervener and Appellant. | A135900<br><br>(Mendocino County Super. Ct. No. SCUK CVG-1057508)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION AND MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The opinion filed herein on June 26, 2013, is modified as follows:

(1) The third line of footnote 2 shall read:

"Proposition 13 was intended to provide effective tax relief and require voter approval of".

Pursuant to California Rules of Court, rules 8.1105, this opinion is certified for publication.

_____

Haerle, Acting P.J.

| | |
|---|---|
| Trial Court: | Mendocino County Superior Court |
| Trial Judge: | Honorable John A. Behnke |
| Attorney for Intervener and Appellant: | David Paland, in pro. per. |
| Attorneys for Plaintiff and Respondent: | Neary and O'Brien, Christopher J. Neary |
| Attorneys for Defendants: | Thomas R. Parker, Mendocino County Counsel, Douglas L. Losak, Chief Deputy, Sandra L. Applegate, Terry N. Gross, Joan H. Turner, Brina A. Latkin, Deputy County Counsels. |