Filed 1/29/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RUSSELL WYATT, | C089702 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201780002634) |
| v. | |
| CITY OF SACRAMENTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Richard K. Sueyoshi, Judge. Reversed with directions.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Andrew C. Rawcliffe; and Chance L. Trimm, City Attorney, for Defendant and Appellant.

Jarvis, Fay & Gibson and Gabriel McWhirter for League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

Benink & Slavens, Vincent D. Slavens, Eric J. Benink; Kearney Littlefield, Thomas A. Kearney, and Prescott W. Littlefield for Plaintiff and Respondent.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty as Amicus Curiae on behalf of Plaintiff and Respondent.

1

After the passage of Proposition 218, Sacramento voters approved a requirement that city enterprises providing water, sewer, storm drainage, and solid waste services pay a total tax of 11 percent of their gross revenues from user fees and charges.  Nineteen years later, Russell Wyatt brought a petition for writ of mandate and complaint for declaratory relief against the City of Sacramento challenging its fees and charges for utility services under article XIII D, section 6, subdivision (b) of the California Constitution (added by Prop. 218, as approved by voters, Gen. Elec. (Nov. 5, 1996)).[1]  It is undisputed that the City set these fees and charges at rates sufficient to fund the payment of the tax to its general fund.  The trial court issued a writ of mandate and judgment in Wyatt's favor.  We reverse the judgment and direct the trial court to vacate its writ of mandate.  By approving the tax in 1998, Sacramento voters increased the cost of providing utility services, rendering those costs recoverable as part of their utility rates and the subsequent transfer of funds permissible under article XIII D.

## I.  BACKGROUND

In 1996, California voters adopted Proposition 218, the Right to Vote on Taxes Act.  (Prop. 218, § 1.)  The measure " ' "buttresse[d] Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." ' " (*City of San Buenaventura v. United Water Conservation Dist*. (2017) 3 Cal.5th 1191, 1200 (*San Buenaventura*).)

Proposition 218 added articles XIII C and XIII D to the California Constitution.  "Article XIII D, like the first two provisions of article XIII A, limits the authority of local governments to assess taxes and other charges on real property.  [Citation.]  Article XIII C buttresses article XIII D by limiting the other methods by which local governments can

---

[1] Unspecified references to "article" are to the California Constitution.

2

exact revenue using fees and taxes not based on real property value or ownership."
(*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 10 (*Redding*).)

As enacted, article XIII C provides that "[a]ll taxes imposed by any local government shall be deemed to be either general taxes or special taxes." (Art. XIII C, § 2, subd. (a).) A general tax is "any tax imposed for general governmental purposes." (*Id*., § 1, subd. (a).) A special tax is "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (*Id*., § 1, subd. (d).) The imposition of either type of tax requires voter approval. (*Id*., § 2, subds. (b), (d).)

"Significantly, Proposition 218 did not define the term 'tax.' That definition was provided 14 years later, with the passage of Proposition 26 in November 2010." (*Redding, supra*, 6 Cal.5th at p. 11.) A "tax" is now defined as "any levy, charge, or exaction of any kind imposed by a local government" unless one of seven exceptions applies. (Art. XIII C, § 1, subd. (e).) One such exception is for "[a] charge imposed for specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (*Id*., § 1, subd. (e)(2).)[2]

Wyatt's claims are raised under article XIII D, which " ' "allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge," ' and places certain restrictions on each kind of exaction."[3] (*San Buenaventura, supra,* 3 Cal.5th at p. 1203; see art. XIII D, § 3, subd.

---

[2] Whether this new exception would apply retroactively to the tax at issue in this proceeding is irrelevant because it was approved by voters. (See *Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County* (2013) 218 Cal.App.4th 195, 198 [Proposition 26 is not retroactive].)

[3] "(a) No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except:

(a).)  The provisions governing fees and charges provide that none "shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership" except "[f]ees or charges for property related services" that satisfy the requirements of article XIII D.  (Art. XIII D, § 3, subd. (a)(4).)

"Like an exaction subject to article XIII C, a property-related fee violates article XIII D if the revenues derived from the fee exceed the amount required to provide the property-related service.  (See art. XIII D, § 6, subd. (b)(1).)  But a property-related fee can also violate article XIII D if revenues derived from the fee are used for any purpose other than that for which it was imposed (see art. XIII D, § 6, subd. (b)(2)) or if the fee is imposed for general government services (see art. XIII D, § 6, subd. (b)(5))."  (*Redding, supra*, 6 Cal.5th at p. 14.)

Through its Department of Utilities, the City provides property-related services, including water, sewer, storm drainage, and solid waste services to residential and commercial customers.  The fees and charges imposed on customers for these services are set by the City.  The City accounts for the revenues from these fees and charges in enterprise funds for each utility service.  The enterprise funds are used to account for the assets and liabilities, and revenues and expenses of each of the utility services.  Prior to 1998, the City imposed what it called "in-lieu franchise and property fees" on its utility

---

"(1) The ad valorem property tax imposed pursuant to Article XIII and Article XIII A.

"(2) Any special tax receiving a two-thirds vote pursuant to Section 4 of Article XIII A.

"(3) Assessments as provided by this article.

"(4) Fees or charges for property related services as provided by this article.

"(b) For purposes of this article, fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership."  (Art. XIII D, § 3.)

enterprises and transferred 11 percent of the revenue from their utility service fees and charges to the City's general fund to fund general governmental services.

After the passage of Proposition 218, Sacramento voters passed Measure I, which approved what is now Sacramento City Code section 3.20.010. It provides:

"There is imposed upon the enterprises operated by the city which provide water, sewer, storm drainage, and solid waste services, a general tax which shall be paid to the city general fund. The tax imposed by this section shall be at the rate of eleven (11) percent of the gross revenues received by the city-operated enterprises from user fees and charges. In levying the tax, the city council may impose a tax rate higher or lower than eleven (11) percent on one more of the enterprises, so long as the total tax paid by all of the enterprises does not exceed eleven (11) percent of the total gross revenues from user fees and charges of all of the enterprises combined."[4]

The correlation between the passage of Proposition 218 and the measure was made plain to voters. The ballot materials asked, " 'In order to comply with Proposition 218, the Right to Vote on Taxes Act, shall the City of Sacramento replace its current in-lieu franchise and property tax fees on water, sewer, drainage and garbage with a general tax which will not result in any changes to existing city utility rates?' "

The ballot materials explained, more specifically, that the City had been imposing "in-lieu franchise and in-lieu property tax fees on the utility enterprise funds which provide water, sewer, storm drain and garbage services . . . . In-lieu property tax fees represent the property tax revenue which would be received by the General Fund if the real and personal property owned by these enterprises were privately owned. The in-lieu franchise fee represents the franchise fees which would be received by the General Fund

---

[4] The measure was originally codified in Sacramento City Code section 41.10.150, adopted by Ordinance No. 98-027.

from private entities as 'rental' or 'toll' for the use of city streets and rights of ways in order to provide their service.

"Private businesses generally provide support to the City through property taxes, business licensing, sales tax, etc. The in-lieu fees imposed on the city utilities were structured to reflect the reasonable cost of doing business for those enterprise activities similar to a private business."

The ballot materials further stated "[t]here are differing opinions as to whether these in-lieu fees comply with . . . Proposition 218, which was passed by the voters in November, 1996. In order to eliminate any doubt, the City is proposing to eliminate the in-lieu franchise and in-lieu property tax fees currently paid by city-operated utilities and replace the fees with a general tax on these enterprises." Voters were told the measure would result in "no changes in *current* city taxes or fees" and "no change in *existing* city utility rates," and the measure "would continue to limit *future* rate *increases* to the actual cost to provide the services." (Italics added.)

The ballot materials explained that, if approved, the measure would add chapter 41.10 to the Sacramento City Code. Section 2 of the measure set forth that proposed chapter, which is now codified at Sacramento City Code section 3.20.010. Section 1 was not codified and explained, in part, that "[i]ncreases to water, sewer, storm drainage, and solid waste rates shall not cause rates to exceed the costs incurred by the City to provide the services. Said costs shall include the tax imposed by Section 2." Consistent with this understanding of the implication of the tax, the rebuttal to the argument in favor of Measure I told voters, "You will save about $7 per month on your utilities bill by voting 'NO.' " Further, "[t]he City is only letting you vote because it faced a taxpayers' lawsuit for this illegal tax."

Each year since 1998, the City has transferred 11 percent of the revenue from the fees and charges from the enterprise funds to its general fund pursuant to Sacramento City Code section 3.20.010. The rate schedules for water, sewer, storm drain, and solid

waste services relevant to this proceeding were adopted by city ordinance in 2015 and 2016. The schedules make no mention of the tax imposed by section 3.20.010.

Wyatt filed a petition for writ of mandate and a complaint for declaratory relief against the City alleging it violates article XIII D, section 6, subdivision (b)(1), (2), and (5) by imposing utility service fees and charges that exceed the costs of providing those services, using the funds for purposes other than providing those services, and using the funds for general governmental services.[5] As the superior court explained, Wyatt bases his challenge on the stipulated fact that the City designed its current utility services fees and charges at rates that generate additional revenue to fund the 11 percent revenue tax and the transfer of this revenue to the general fund.

The superior court granted the petition for writ of mandate and found in favor of Wyatt on his claim for declaratory relief. The court found that the utility service fees and charges, "including the surcharge to fund the transfer of revenue to the general fund," constitute fees and charges as defined in article XIII D, section 2, subdivision (e). The court concluded the City did not attempt to show that these fees and charges did not exceed the funds required to provide the property-related service. The court held it was insufficient for the City to assert that the tax was a cost of service such that it was recoverable through the City's rates without further proof. Ultimately, the court held that the City's utility service fees and charges, "including the additional amounts charged to [Wyatt] to fund the 'general tax' and transfer of revenue to the general fund pursuant to [Sacramento City Code s]ection 3.20.010, are invalid under article XIII D, section 6[, subdivision ](b)(1), (2) and (5)." The court entered judgment accordingly. The court also issued a peremptory writ of mandate directing the City to: (1) cease charging Wyatt and other ratepayers fees and charges for utility services that include the amounts to

---

[5] Wyatt's petition also stated that the City violated article XIII D, section 6, subdivision (b)(3), but the superior court found he abandoned this argument.

transfer funds pursuant to Sacramento City Code section 3.20.010, and (2) cease those transfers.  The City filed a timely appeal.

## II.  DISCUSSION

*A.      Standard of Review*

This appeal raises questions of law that we decide on independent review of the facts.  (See *San Buenaventura*, *supra*, 3 Cal.5th at p. 1204 ["Whether an exaction is a property-related charge for purposes of article XIII D 'is a question of law for the appellate courts to decide on independent review of the facts' "].)  "We construe the provisions of article XIII D liberally, ' "to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." ' [Citation.]  The relevant government agency—here, the [City]—bears the burden of demonstrating compliance." (*Ibid*.; see also art. XIII D, § 6, subd. (b)(5) ["In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article"].)

*B.      Article XIII D*

Wyatt's action challenges the City's utility rates under article XIII D, section 6, subdivision (b), which provides, in relevant part:

"A fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements:

"(1)  Revenues derived from the fee or charge shall not exceed the funds required to provide the property related service.

"(2)  Revenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed.

"[¶] . . . [¶]

"(5)  No fee or charge may be imposed for general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property

8

owners.  [¶]  Reliance by an agency on any parcel map, including, but not limited to, an assessor's parcel map, may be considered a significant factor in determining whether a fee or charge is imposed as an incident of property ownership for purposes of this article."

We begin by identifying the relevant fee or charge within the meaning of article XIII D.  The article defines " '[f]ee' or 'charge' " to mean "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service."  (Art. XIII D, § 2, subd. (e).)  A " '[p]roperty-related service' " is "a public service having a direct relationship to property ownership."[6]  (*Id*., § 2, subd. (h).)

Fees and charges subject to article XIII D include fees imposed for water, sewer, storm drainage, and solid waste services such as the ones set here by the City and imposed on its utility customers.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 260, fn. 3 ["Proposition 218 also imposed restrictions on the imposition of fees and charges for property-related services, such as sewer and water services"]; *Richmond v. Shasta Community Services Dist*. (2004) 32 Cal.4th 409, 427 [fee for ongoing water service is a fee or charge under article XIII D].)

Sacramento City Code section 3.20.010 itself is not imposed upon a parcel or on a person as an incident of property ownership or a user fee or charge for a property-related service; it is imposed on the utility enterprises' revenue.  Nothing in the terms of the provision requires that the cost be imposed on users.  (See *Redding*, *supra*, 6 Cal.5th at p. 15 [utility "had more than enough non[-]rate revenue to cover the PILOT" (payment in lieu of taxes)].)  While the City designed its utility fees and charges at rates sufficient to

---

[6] " 'Property ownership' " "include[s] tenancies of real property where tenants are directly liable" to pay the fee or charge in question.  (Art. XIII D, § 2, subd. (g).)

9

fund the transfer of revenue pursuant to Sacramento City Code section 3.20.010, the fact that at least part of the tax is included in these fees and charges does not mean that the tax itself is a fee or charge under article XIII D.

*Redding*, *supra,* 6 Cal.5th 1 is instructive. The City of Redding operated an electric utility as a department of its city government. (*Id*. at p. 4.) Each year, a "payment in lieu of taxes" was transferred from the utility's enterprise fund to the city's general fund. (*Id*. at pp. 4-6.) The payment was "based on the amount [the electric utility] would pay in property taxes under Proposition 13 if it were a private enterprise, rather than a city department." (*Id*. at p. 6.) The question presented was whether this practice violated article XIII C by constituting a tax that was not approved by voters. (*Redding, supra*, at pp. 4-5.) The parties agreed the PILOT itself was not a tax. (*Id*. at p. 12.) The court quoted an explanation offered in an amicus brief: " '[t]he budgetary act of *transferring sums* from one fund to the other does not constitute' the imposition of a levy, charge, or exaction by a local government on those who pay the charge. Accordingly, the PILOT per se cannot be a tax. It is only the *rate*, not the PILOT, that is imposed on customers for electric service. The critical question is whether [the utility's] rates themselves exceeded its reasonable costs of providing electricity" such that it was a tax under article XIII C. (*Redding, supra*, at p. 12; see also *id*. at pp. 14-15 ["*Webb* [*v. City of Riverside* (2018) 23 Cal.App.5th 244] correctly identifies the electric *rate* charged by the utility as the ' "levy, charge, or exaction" ' subject to article XIII C's restrictions"].) Likewise, here our focus is on the rates set for the City's utility customers and whether they violate article XIII D, section 6, subdivision (b)(1), (2), or (5).

Article XIII D, section 6, subdivision (b)(5), provides "[n]o fee or charge may be imposed *for* general governmental services." (Italics added.) At least as an initial matter, we cannot conclude the fees and charges at issue violate this provision. They are, on their face, imposed for the services provided. Again, however, the City has explained that it sets these utility service fees and charges at rates sufficient to fund the payment of

the revenue tax pursuant to Sacramento City Code section 3.20.010. Under article XIII D, section 6, subdivisions (b)(1) and (2), "[r]evenues derived from the fee or charge shall not exceed the funds required to provide the property related service" and "shall not be used for any purpose other than that for which the fee or charge was imposed." Thus, the ultimate question presented by this proceeding is whether the City may include in the amount required to provide property-related services amounts to cover the tax imposed by Sacramento City Code section 3.20.010. As we explained in *Howard Jarvis Taxpayers Ass'n v. City of Roseville* (2002) 97 Cal.App.4th 637 (*Roseville*), "[t]he theme of these sections [article XIII D, section 6, subdivisions (b)(1), (2), and (5)] is that fee or charge revenues may not exceed what it costs to provide fee or charge services. Of course, what it costs to provide such services includes all the required costs of providing service, short-term and long-term, including operation, maintenance, financial, and capital expenditures. The key is that the revenues derived from the fee or charge are required to provide the service, and may be used only for the service. In short, the section 6[, subdivision ](b) fee or charge must reasonably represent the cost of providing service." (*Id.* at pp. 647-648.)

The City contends its utilities may recover the cost of lawful taxes from retail rates. Wyatt argues Sacramento City Code section 3.20.010 is not properly classified as a tax.[7] We agree the actual transfer of funds between accounts is not a tax. (*Redding, supra*, 6 Cal.5th at p. 12.) But section 3.20.010 imposes a specific obligation of 11 percent of gross revenues on the utility enterprises. Additionally, the way Sacramento City Code section 3.20.010 operates is at least akin to a tax. (Cf. *Capistrano Taxpayers*

---

[7] Wyatt filed a motion seeking judicial notice of various provisions of the Sacramento City Code related to other taxes. We deferred ruling on this motion and now deny it, without reaching the merits, on the ground that they are immaterial to our conclusion on appeal.

11

*Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493, 1515 ["The way Proposition 218 operates, water rates that exceed the cost of service operate as a tax, similar to the way a 'carbon tax' might be imposed on use of energy"].) And it is not prohibited by article XIII, section 3's prohibition on imposing a property tax on these enterprises. For our purposes, section 3.20.010 imposes a tax. Moreover, the critical point is we have no indication the 11 percent charge is not an otherwise valid levy. Further, we see no basis to conclude that when a utility is charged this tax on the user fees and charges it receives from customers, that does not become an ongoing cost of providing the service within the plain meaning of that term. (See *Southern California Gas Co. v. Public Utilities Com.* (1979) 23 Cal.3d 470, 474 ["As taxes are part of a utility's cost of service, this expense is borne by the ratepayers"]; *City & County of San Francisco v. Public Utilities Com.* (1971) 6 Cal.3d 119, 123 ["In computing the cost of service for rate making purposes, the utility is allowed to recover its federal income taxes as a cost of business"].) The fact that the tax can be imposed differently on the different enterprises does not change its basic nature as a cost required to provide the services.

The superior court determined it was insufficient for the City to assert that the revenue tax was a cost of service such that it was recoverable through the City's rates without further proof. The superior court and Wyatt reason by analogy to our prior decision in *Roseville* and the decision of the Fifth District in *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914 (*Fresno*) in reaching this conclusion. However, the in-lieu fees invalidated in *Roseville* and *Fresno* are factually distinguishable. The legality of the fees and charges at issue in this proceeding depend only on the application of the relevant constitutional provisions to these undisputed facts. The fact that other cities have unsuccessfully attempted to raise money from their utilities for their general funds is of limited relevance to the question before us.

We described the facts in *Roseville* as follows: "Roseville imposes an 'in-lieu franchise fee' . . . of 4 percent on each of the utilities' annual budgets; this fee is paid by

12

the utility ratepayers and transferred to Roseville's general fund." (*Roseville*, *supra*, 97 Cal.App.4th at p. 638.) We concluded that "the in-lieu fee for Roseville's water, sewer, and refuse services, a fee not dependent upon the quantity of service used, is a fee imposed upon a parcel or upon a person as an incident of property ownership for Proposition 218 purposes." (*Id.* at pp. 644-645.) Perhaps the most significant statement in that opinion is this: "[T]he evidence shows, and the parties have treated, the in-lieu fee, for Proposition 218 purposes, as a separate, independent fee for water, sewer, and refuse collection services, *and not simply as a component part of another fee*." (*Id.* at p. 647, italics added.) We then concluded the fee violated article XIII D, section 6, subdivision (b). (*Roseville, supra*, at p. 650.) As the parties note, we took judicial notice of two local ballot measures that purported to amend Roseville's charter after the trial court proceedings:

"Measure U amended the charter to state that 'Each city-owned utility shall be financially self-sufficient, and shall fully compensate the city general fund for all goods, services, real property and rights to use or operate on or in city-owned real property.'

"Measure K purportedly amended the charter to provide that for purposes of accounting for the use of the public right-of-way, Roseville's utilities may pay to Roseville's general fund an in-lieu franchise fee not to exceed 4 percent of total utility operating and capital expenditures, which shall be budgeted and appropriated solely for police, fire, parks and recreation, or library services. The impartial ballot analysis for Measure K, written by Roseville's city attorney, stated that the measure, 'if enacted, would validate the in[-]lieu franchise fee concept as representing an element of the actual cost of providing utility services to the public.'

"These measures do not turn the tide for Roseville by displaying the costs the in-lieu fee covers. Measure U simply states that Roseville's utilities will pay Roseville for what the city provides the utilities, including real property and rights to use or operate on or in city-owned real property. Proposition 218 has no quarrel with Measure U in theory,

13

but the measure does nothing to show what the actual costs of that real property, usage or operation are. And Measure K suffers from a similar deficiency. It states that the utilities may pay an in-lieu fee 'not to exceed four percent (4) of total operating and capital expenditures'—again, this measure does nothing to show actual costs. The city attorney's analysis of Measure K is couched similarly in theoretical terms: the measure 'would validate the in[-]lieu franchise fee *concept* as representing an element of the actual cost of providing utility services . . .' (italics added); moreover, the in-lieu revenues under Measure K are to be spent solely on police, fire, parks and recreation, or library services, rather than on actual costs of providing utility service. Because it is unnecessary to do so, we express no views regarding the validity of Measure K." (*Roseville*, *supra*, 97 Cal.App.4th at pp. 649-650.)

Here, not only has Sacramento treated the revenue tax on utilities as a component of its utility service fees, but the voters' adoption of Measure I resulted in a specific cost obligation being placed on the utility enterprises. By contrast, though we expressed no opinion regarding the validity of Roseville's Measure K, neither measure mandated payment on the part of the utilities nor created a cost that would be reimbursable under article XIII D, section 6.

In *Fresno*, a provision of the city charter approved by voters prohibited a municipal utility from being used directly or indirectly to produce general revenue for the City, but permitted each utility to pay to the city's general fund an amount " 'in lieu of property and other taxes normally placed upon private business enterprises' " as set by ordinance. (*Fresno, supra*, 127 Cal.App.4th at p. 917.)[8] An ordinance, in turn, required each utility to " 'pay to the City, in lieu of property and other taxes normally placed upon private business,' an amount designated by the council." (*Ibid.*) At the time of the

_____

[8] A separate section of the city charter prohibited the city from taxing any person for using a utility service. (*Fresno, supra*, 127 Cal.App.4th at p. 927.)

14

proceedings, the city collected an in-lieu fee equal to one percent of the assessed value of each utility's fixed assets. (*Ibid.*) These fees were blended into each utility's service charges. (*Id*. at p. 918.) The *Fresno* court held the in-lieu fee invalid under article XIII D. (*Fresno, supra,* at p. 927.) The court explained that the fee was "expressly imposed upon the ownership of property *by the utility* itself" and was thus subject to the restrictions of article XIII D, section 6. (*Fresno, supra,* at p. 926; see art. XIII D, § 2, subd. (e) [a fee or charge is "any levy . . . imposed by an agency upon a parcel or upon a person as an incident of property ownership"].) The court held the in-lieu fee is a "cost of doing business that the utilities are entitled to recover, if it is a permissible cost of doing business in the first instance." (*Fresno, supra,* at p. 927.) The court concluded Fresno did not meet its burden to demonstrate compliance with article XIII D because "Fresno has not even *claimed* the in[-]lieu fee approximates the cost of city services to the utility departments and divisions, much less has it established such a relationship as a fact." (*Fresno, supra,* at p. 928.) The revenue tax in this proceeding was not a tax on property and thus must be analyzed only as a component of the rate for purposes of article XIII D. In this context, the revenue tax is a cost of providing the utility service. In Fresno, however, no similar obligation or cost was created. For these reasons, *Fresno* is distinguishable.

Wyatt's final argument that the tax cannot be a recoverable cost is a circular one— that Sacramento voters could not authorize the tax because it results in a general fund transfer in violation of article XIII D. In general, he contends permitting this practice would "eviscerate Proposition 218's restrictions on property-related fees." We disagree. In adopting Proposition 218, the people found and declared "that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California

15

economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Prop. 218, § 2.) Here, the City sought and received consent from voters to tax 11 percent of its utilities' revenues from customer fees and charges, and thereby maintain that specific cost as part of the fees and charges for using the utilities. This was clear to voters, and they approved the arrangement anyway. Neither the purpose nor the plain language of Proposition 218 has anything to say about this situation.

As our Supreme Court said in *Redding*, "for any service charge to which [] article [XIII C] applies, a local government must either charge a rate that does not exceed the reasonable costs of providing the service or obtain voter approval for rates that exceed costs." (*Redding, supra*, 6 Cal.5th at p. 18.) Wyatt contends we should disregard this quote because it has nothing to do with compliance with article XIII D. Our Supreme Court said this, however, after distinguishing *Roseville* and *Fresno* and explaining that "a property-related fee can . . . violate article XIII D if revenues derived from the fee are used for any purpose other than that for which it was imposed (see art. XIII D, § 6, subd. (b)(2)) or if the fee is imposed for general government services (see art. XIII D, § 6, subd. (b)(5)). Thus, in *Roseville* and *Fresno*, the fact that the utilities were transferring rate proceeds to the cities' general funds, where those proceeds could be used for general government services, created an independent violation of article XIII D." (*Redding, supra,* at p. 14.) Under these circumstances, we do not believe our Supreme Court would have suggested obtaining voter approval for rates that exceed costs under article XIII C if it believed this would violate article XIII D. Nor was the court describing only a special tax. We conclude that, through Measure I, the City obtained the necessary voter approval described in *Redding*. Wyatt's claim that the general fund transfer mandated by Sacramento City Code section 3.20.010 and the use of utility rates to generate these funds violates article XIII D, section 6, subdivision (b) must be rejected.

## III.  DISPOSITION

The judgment is reversed.  The matter is remanded to the superior court with directions to vacate its writ of mandate.  The City of Sacramento shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/S/

_____
RENNER, J.


We concur:

/S/

_____
RAYE, P. J.


/S/

_____
MAURO, J.

17